United States Court of Appeals,

Eleventh Circuit.

No. 96-3158

Non-Argument Calendar.

RETINA ASSOCIATES, P.A., Plaintiff-Appellant,

v.

SOUTHERN BAPTIST HOSPITAL OF FLORIDA, INC., d.b.a. Baptist
Medical Center; Richard L. Simmons, M.D.; Richard L. Simmons,
M.D., P.A.; Gerald A. Coluccelli, M.D.; Gerald A. Coluccelli,
M.D., P.A., et al., Defendants-Appellees,

Baptist Eye Institute, Inc.; BEI, Inc., Movants.

Feb. 19, 1997.

Appeal from the United States District Court for the Middle
District of Florida. (No. 94-255-CIV-J-10), William Terrell
Hodges, Judge.

Before TJOFLAT, BIRCH and CARNES, Circuit Judges.

PER CURIAM:

We affirm the judgment of the district court for the reasons
set out in its dispositive order which is reproduced in the
appendix.

AFFIRMED.

APPENDIX

*ORDER*

This antitrust case is before the Court on the parties'
cross-motions for summary judgment. Because the Court finds that
the rule of reason, as opposed to the *per se* doctrine, governs
Count I of Plaintiff's complaint, and because there appears to be
no genuine issue of material fact as to the lack of anticompetitive
effects of the alleged concerted refusal to deal, Defendants'
motions for summary judgment on Count I will be granted. Because

Plaintiff has failed to demonstrate the existence of a triable fact issue with regard to Defendant Florida Retina Institute's alleged anticompetitive conduct or specific intent to monopolize, summary judgment will also be granted on Count II of the complaint.

*FACTS*

Retina Associates, P.A. ("RA"), the sole plaintiff in this case, is a Florida professional corporation whose shareholders are Dr. Fred H. Lambrau, Jr., M.D. and Dr. Michael Stewart, M.D.  Drs. Lambrau and Stewart are board-certified ophthalmologists who have specialized in the diagnosis and treatment of diseases of the retina and vitreous.  As the name would suggest, RA's practice is limited to retina-related ophthalmology.

Defendant Southern Baptist Hospital of Florida, Inc., doing business as Baptist Medical Center ("Baptist"), is a not-for-profit Florida corporation that owns and operates the Baptist Medical Center, the largest acute care hospital in Jacksonville, Florida.  Situated on the Baptist Medical Center campus is a four-story building that houses the Baptist Eye Institute ("BEI").  BEI is an amalgamation of non-specialized ophthalmologists comprised of Defendants Richard L. Simmons, M.D., Gerard A. Coluccelli, M.D., Ernst Nicolitz, M.D., Charles P. Adams, Jr., M.D., Frank W. Bowden, III, M.D., Neil T. Shmunes, M.D., and Jeffrey H. Levenson, M.D.  All of the BEI defendants except Dr. Levenson have incorporated their medical practices and are the principal shareholders of these professional corporations.  The professional corporations are also named defendants.

Sometime in 1989 Dr. Simmons, apparently on behalf of

Defendants Coluccelli, Nicolitz, Adams and Bowden[1], approached RA with a proposal for the formation of an ophthalmological services group involving several non-specialized ophthalmologists, one or more retina specialists, other ophthalmological specialists and a major local hospital. The proposal involved marketing the group and cross-referral relationships among the involved parties. Simmons goal for the venture was to offer a full range of ophthalmological services in one location.

General ophthalmologists typically refer patients with specific retina problems to retina specialists.[2] That being the case, a retina specialist was perceived as necessary for the venture to provide a wide array of ophthalmological practitioners under one roof. Prior to the events constituting the gravamen of the complaint, RA alleges that it received the majority of retina referrals from the BEI five.

RA declined Simmons' offer to participate in the group. Meanwhile, the BEI five searched for a hospital that would support the venture. Baptist ultimately decided to participate and agreed to construct a "state of the art and user friendly" building for the provision of myriad ophthalmological services. The building was to contain office space for the ophthalmologists involved as well as space for a diagnostic center and outpatient surgery.

True to the "one-stop shop" concept, the BEI five continued to

---

[1]For convenience, these defendants will be collectively referred to as the BEI five.

[2]Plaintiff's expert, Dr. McClave, estimates that approximately ninety percent of the patients treated by Jacksonville based retina specialists are referred by other health care providers.

look for retina specialists willing to participate.  RA again declined an offer to join the group.  The BEI five also approached Defendant James A. Staman, M.D., another retina specialist and the principal shareholder of Defendant Florida Retina Institute, James A. Staman, M.D., P.A. ("FRI"). [3]  In February of 1990, Staman accepted the proposal but withdrew from the venture in May 1990. Staman and FRI rejoined BEI permanently in September of 1991.  The complaint alleges that the agreement with FRI included the promise that FRI would receive all of the retina referrals from the BEI physicians.

The BEI five started, as a group, seeing patients in early 1990, and the BEI building at the Baptist Medical Center campus opened in the fall of 1991.  Staman and the other FRI specialists began seeing patients in the BEI building shortly thereafter. Defendant's Levenson and Shmunes joined the BEI five in 1993, and opened offices in the BEI building.

The parties estimate that there are between 45 and 50 practicing general ophthalmologists in the Jacksonville area. Plaintiff's best estimate, assuming the appropriateness of its definition of the relevant product and geographic markets, is that the BEI physicians referrals to retina specialists amount to fifteen percent of the total referrals made.  While the record discloses some exceptions, FRI has received almost all of the referrals for retina specialty work from the BEI physicians since

---

[3]At the time this lawsuit was commenced, there were three retinal specialty practices in Jacksonville:  RA, Florida Retina Institute and that of Dr. James Bolling who is affiliated with the Mayo Clinic.

Staman and FRI joined the group.

On March 21, 1994, Plaintiff filed a complaint (Doc. 1) alleging that the BEI physicians' referral of almost all of their retina cases to FRI violates federal antitrust laws. Count I, against all Defendants, maintains that the alleged exclusive referral agreement constitutes a horizontal concerted refusal to deal or group boycott in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Count II, against Staman and FRI only, alleges that their participation in the alleged exclusionary conduct constitutes an attempt to monopolize in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2. The complaint prays for monetary and injunctive relief. The parties have engaged in voluminous discovery. Plaintiff and all defendants have filed cross-motions for summary judgment on Count I of the complaint. Defendants Staman and Florida Retina Institute have filed a motion for summary judgment on Count II. All of the motions have been thoroughly briefed.

*DISCUSSION*

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). In making this determination, the Court must examine the pleadings, affidavits and other evidence in the record "in the light most favorable to the non-moving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The moving party has the initial burden of establishing the nonexistence of a triable fact issue. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 106 S.Ct. 2458, 91 L.Ed.2d 265 (1986). If the movant is successful on this score, the burden shifts and the non-moving party must come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories or other evidence to demonstrate that a genuine fact issue remains to be tried. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

*A. The Horizontal Concerted Refusal to Deal Claim*

Plaintiff contends that the exclusive referral agreement between the BEI physicians and Staman and the FRI constitutes a horizontal concerted refusal to deal or group boycott violative of Section 1 of the Sherman Act as a combination in restraint of trade. Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations...." A Section 1 Plaintiff must establish an agreement between two or more persons to restrain trade affecting interstate commerce. Unilateral conduct will not trigger the prohibition of Section 1. *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984), *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1455 (11th Cir.1991).

Assuming, without deciding, that the conduct alleged here

constitutes an agreement among several individuals[4] to refer retina cases solely to FRI and to thereby refuse to deal with RA, RA must still establish that the purported agreement *unreasonably* restrains competition. *Standard Oil Co. v. United States,* 221 U.S. 1, 58-64, 31 S.Ct. 502, 515-17, 55 L.Ed. 619 (1911). A restraint may be violative of the Sherman Act because it is solely a naked restraint of trade so offensive to competition as to be unreasonable *per se,* or because it runs afoul of the more detailed rule of reason inquiry. *F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457-58, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986). Conduct is unreasonable *per se* when it "always or almost always tend[s] to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19-20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Claims under the Sherman Act are presumptively evaluated under the rule of reason. *Levine v. Cent. Florida Medical Affiliates,* 72 F.3d 1538, 1549 (11th Cir.1996) (quoting *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1567 (11th Cir.1991)).

1. Is the Conduct *Per Se* Unreasonable?

Plaintiff contends that it is entitled to summary judgment because the alleged horizontal concerted refusal to deal or group boycott is properly considered unreasonable *per se. E.g., Klor's*

---

[4]Whether there is an actual combination or conspiracy appears to be an issue among the parties. Defendants seem to argue that BEI is a legitimate joint venture and that the referral of patients exclusively to FRI is reasonably necessary to effectuate its purpose. However, assuming defendants can establish the existence of a joint venture, its practices would not thereby automatically be immune from antitrust scrutiny. *See* 2 EARL W. KINTNER, FEDERAL ANTITRUST LAW § 9.15 (1980).

*Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). However, the recent jurisprudence of the Supreme Court and of the Court of Appeals of this Circuit cautions against the haphazard expansion of the "group boycott label" and the concomitant imposition of *per se* liability. *Indiana Fed'n,* 476 U.S. at 458, 106 S.Ct. at 2018, *Levine,* 72 F.3d at 1550 (citing *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.,* 720 F.2d 1553, 1561 (11th Cir.1983)). "[T]he *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor...." *Indiana Fed'n,* 476 U.S. at 458, 106 S.Ct. at 2018. Unless the conspirators imposing the group boycott possess "market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.,* 472 U.S. 284, 296, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985).

In sum, the *per se* rule requires a historically focused inquiry directed at ascertaining whether the behavior complained of is of the type that regularly poses anticompetitive consequences. Where prior cases have shown that a certain practice is of this type, a deleterious effect on the market will be presumed and no detailed market analysis is required. Where the anticompetitive effect of a practice is not historically clear, the practice may still be *per se* violative of the antitrust laws if a preliminary examination of market conditions surrounding the alleged restraint

at issue reveals such an impact absent any procompetitive justification. *Indiana Fed'n,* 476 U.S. at 458-59, 106 S.Ct. at 2018 ("[W]e have been slow ... to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious...."); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 15-19, 104 S.Ct. 1551, 1560-61, 80 L.Ed.2d 2 (1984). This examination of market forces is not as detailed as the one required by the rule of reason, and has been referred to as a "quick look" at market conditions. *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 594 (1st Cir.1993).

Plaintiff's argument for evaluation of this case under the *per se* rule must fail for two reasons: (1) the boycott alleged here is not of the type that has been historically shown to always or almost always adversely affect competition; and (2) the market power possessed by defendants in terms of patient referrals is insufficient as a matter of law to justify *per se* treatment.

Assuming, for the moment, that Plaintiff is able to establish that the BEI physicians have sufficient market power, analyzing this case under the *per se* rubric would remain inappropriate absent some demonstration that the practice at issue historically leads to anticompetitive effects in the market. *Levine,* 72 F.3d at 1550 (citing *Consultants and Designers,* 720 F.2d at 1562)). *Levine* involved a Section 1 attack by an internist excluded from a PPO panel and a physician provider network.

Levine alleged that the exclusion constituted a concerted refusal to deal. The PPO and provider network contended that

Levine was excluded because no more internists were needed in Levine's area. In affirming a district court's grant of defendants' motion for summary judgment, the Eleventh Circuit declined to apply the *per se* rule. *Id.* at 1550-51.

The court, relying on a recently issued DOJ Enforcement Policy, held that the courts have had insufficient experience with multiprovider networks to justify condemning their exclusion practices as *per se* violative of the Sherman Act. *Id.* at 1550. In an effort to contain costs and enhance the competitive ability of the network, multiprovider networks typically contract with some, but not all, health care providers in a given area. Additionally, multiprovider network membership restrictions may yield a procompetitive benefit by giving those excluded the impetus to form competing networks. *Id.* (quoting DOJ Enforcement Policy, *available in* WESTLAW, 1994 WL 642477, at *42).

*Levine's* analysis on this score is equally applicable to the this case. Testimony, in the record, apparently uncontroverted, demonstrates that it is not at all unusual for networks like BEI to affiliate with only a single retina group. BEI's guiding goal is the provision of a "one-stop shop" for eye care and the cost-containment and convenience that it represents. Further, since BEI's inception, two competing multiprovider eye care networks formed.[5] The anticompetitive effect of the alleged

---

[5]In early 1994, the Florida EyeCare Network was formed. Plaintiffs' principals were among the initial shareholders of the network and are the only retina specialists in the network, although, according to Plaintiff, there is no agreement to refer retina patients solely to RA. Plaintiff also refers to the Florida EyeCare Network as an unsuccessful venture, but does not appear to attribute that lack of success to any allegedly illegal

boycott is far from being "immediately obvious" and, as such, analysis under the *per se* rule is improper. *Indiana Fed'n,* 476 U.S. at 459, 106 S.Ct. at 2018.

Plaintiff contends that the reasoning of *Levine* and the DOJ enforcement policy is inapplicable here because those authorities dealt with the ability of physicians to combine to jointly meet the needs of managed care organizations. Here, Plaintiff contends, the BEI physicians are illegally colluding to provide joint services to non-managed care patients for whom they would normally compete. However, here the Plaintiff is claiming injury from the alleged refusal to refer patients to RA, not from the underlying arrangement among the BEI physicians to treat non-managed care patients. It is, therefore, the exclusion from patient referrals that must be scrutinized for consistently anticompetitive effect before *per se* analysis may properly be applied. *See Northwest Wholesale Stationers, Inc.,* 472 U.S. at 295-96, 105 S.Ct. at 2620 (reasoning that where the Plaintiff is not objecting to the underlying arrangement but rather to expulsion from cooperative association, it is the act of exclusion that must be evaluated before the arrangement is condemned as illegal *per se*). The reasoning of *Levine* and the DOJ Enforcement Policy indicates that the anticompetitive effect of the challenged exclusionary conduct is not fully understood and therefore should not be condemned out of hand.

Plaintiff also argues that the BEI/FRI exclusive dealing

conduct of defendants. A third network, Eye Care Associates of North Florida, has also been formed. Dr. Bolling, of the Mayo Clinic, is the exclusive retina care provider for that network.

arrangement represents control over retina referrals necessary for Plaintiff to compete because those referrals represent "relationships" which RA needs "in the competitive struggle." *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The alleged boycott, plaintiff claims, has caused it to "lose a significant volume of trading" and has "hampered substantially" Plaintiff's ability to compete. *Id.,* 373 U.S. at 348, 83 S.Ct. at 1252. However, apart from bald assertion, Plaintiff presents no factual or evidentiary justification for such a finding. Plaintiff has not demonstrated that the Defendants' power over the market of referrals is sufficient to hamper Plaintiff in its effort to compete.

Plaintiff's best case scenario is that the BEI physicians control fifteen percent of the referrals made by general ophthalmologists to retina specialists in the Jacksonville area. This leaves plaintiff capable of vigorously competing for the other eighty-five percent of referrals. Courts have refused to impose antitrust liability upon greater showings of market power. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. at 16-25, 104 S.Ct. at 1560-1565 (holding that in product-tying claim thirty percent control of relevant market was insufficient to warrant a finding of *per se* invalidity); *U.S. Healthcare,* 986 F.2d at 596 (1st Cir.1993) (holding that power over twenty-five percent of relevant market insufficient to justify, under the rule of reason, Sherman Act liability for vertical exclusivity arrangement).

The determination that *per se* analysis is inapplicable in this case is reinforced by RA's remarkable success during the years of

the alleged boycott. In 1990, when FRI participated in the venture for only three months, Plaintiff's gross revenues were slightly in excess of one and one-half million dollars. By contrast, RA's gross revenues, derived from the practice of only two physicians, consistently exceeded two million dollars annually between 1991 and 1994, when the asserted boycott was in full effect. In addition, Plaintiff's records disclose, during the years of the boycott, a referral base of one hundred and fifty physicians; and more, RA has opened satellite offices in St. Augustine, Florida and Waycross, Georgia. Further, Plaintiff has joined a competing comprehensive eye care network. It clearly appears, therefore, that RA has competed successfully despite the alleged refusal to deal. As such, RA should not be heard to complain that Defendants' use of fifteen percent of the available market is *per se* unreasonable. The antitrust laws were designed to protect competition, not competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962). Attempts to win the "Super Bowl of remuneration" by invoking rules of *per se* invalidity cannot be countenanced. *Levine,* 72 F.3d at 1551.

2. Is the Conduct Illegal under the Rule of Reason?

Because Plaintiff has failed to establish the applicability of a *per se* analysis in the instant case, the presumption that the rule of reason inquiry governs Section 1 claims remains intact. Under the rule of reason, the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States,* 246

U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). To establish that conduct violates Section 1 under the rule of reason, RA must prove that (1) Defendant's conduct had an anticompetitive effect in the relevant market; and (2) that no procompetitive rationale would justify the conduct. *Levine,* 72 F.3d at 1551. In showing that the conduct has an anticompetitive effect, Plaintiff may establish either actual anticompetitive effects of the conduct or the potential for genuine anticompetitive effect. *Id.* To successfully show potential anticompetitive effects, the Plaintiff must first define the relevant geographic and product markets and then prove that the Defendants possessed power in that market. *Indiana Fed'n,* 476 U.S. at 460-61, 106 S.Ct. at 2019.

### a. is there any actual anticompetitive effect?

Plaintiff asserts three grounds upon which the alleged boycott may be found to have actual anticompetitive effects. First, Plaintiff argues that the alleged exclusive referral agreement between the BEI physicians and the Florida Retina Institute has resulted in higher prices to the consumer for common diagnostic procedures. As evidence of this claim, Plaintiff contends that FRI patients referred by BEI pay a higher price for fluorescein angiograms than other patients because, in addition to FRI's charge for the service, Baptist charges its own fee for the use of its equipment and personnel at the BEI building.

Plaintiff is particularly poorly suited to raise this claim because, should the evidence bear the claim out, Plaintiff stands to benefit. Plaintiff, as a response, can either raise its fees for the same procedures and earn more money, or capitalize on its

lower prices in the hope of competing more efficiently.  Where a plaintiff stands to benefit from a price increase, it cannot recover for a combination imposing nonprice restraints, here a group boycott, that has the effect of raising the market price. *Matsushita Elec. Indus. Co. v. Zenith Radio Co., Ltd.,* 475 U.S. 574, 562-63, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986).  As a result, the claim by this Plaintiff that the alleged boycott has resulted in higher prices for some procedures is insufficient as a matter of law.

Second, the Plaintiff asserts, when Dr. Levenson joined the BEI physicians in 1993, he cancelled a subcontract with plaintiff to refer patients Levenson had under a contract with PruCare HMO to RA for any applicable retina treatments.[6]  When Levenson informed RA of his decision, RA offered to lower its price in order to keep the contract.  Levenson subsequently awarded the contract to FRI. Plaintiff contends that this constitutes a detrimental effect on competition because the savings that could have been achieved by leaving the contract with RA could have been passed on to PruCare and its subscribers.  Plaintiff, for the same reasons stated above, is particularly ill suited to raise this claim and it is therefore insufficient to raise an issue of actual detrimental effect.

Finally, Plaintiff contends that the six BEI physicians who perform radial keratotomy procedures have engaged in illegal price fixing.  Deposition testimony of one of the BEI doctors establishes that the BEI physicians agreed on a price of $1350 as a benchmark

---

[6]There is no allegation that Levenson breached any contractual relationship he had with RA when he cancelled the contract.

for the procedure. This claim can be summarily dismissed as it has absolutely no relationship to the concerted refusal to deal alleged by Plaintiff and has caused the Plaintiff no damages. The record is devoid of any evidence establishing that the alleged price fixing is in any way connected to the concerted refusal to deal of which Plaintiff complains.

b. is there any potential anticompetitive effect?

As noted above, to establish potential anticompetitive effect amounting to a violation of Section 1 under the rule of reason, the evidence must show that the defendants possess market power. This power must be shown to exist in properly defined geographic and product markets. Further inquiry into market definition in this case is, however, unnecessary. Assuming, arguendo, that plaintiff's definition of the relevant geographic and product markets pass legal muster, fifteen percent of the retina referral market is insufficient, as a matter of law, to establish market power.

Because plaintiff has failed to establish that the *per se* rule governs the case and because there appears to be no triable fact issue under the rule of reason, defendants' motions for summary judgment on Count I of the complaint should be granted.

*B. The Attempted Monopolization Claim*

Plaintiff has also alleged that Staman and FRI have violated Section 2 of the Sherman Act by attempting to monopolize the market for retina services. Staman and FRI have moved for summary judgment on that claim.

To prove attempted monopolization, a plaintiff must prove

that: (1) Defendant has engaged in predatory or anticompetitive conduct; (2) a specific intent on Defendant's part to monopolize; and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). There is no evidence to support either the first or second elements of the claim.

Staman and FRI argue that there is no evidence of anticompetitive or predatory conduct sufficient to support a Section 2 claim. They point to the fact that they did not actively seek to affiliate with the BEI physicians and their initial reluctance to join BEI. Plaintiff relies on Staman's and FRI's participation in an unlawful group boycott to establish the necessary predatory conduct. While participating in an unlawful horizontal group boycott may be sufficient to establish a Section 2 claim, here such a finding is precluded by the Court's grant of summary judgment against Plaintiff on Count I. As such, there is no genuine issue of material fact as to the existence of predatory conduct.

Proof of the intent element requires proof of "a specific intent to destroy competition or build a monopoly." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed.2d 1277 (1953). Plaintiff, in addition to Defendant's participation in the boycott, points to a letter from FRI seeking a commitment from BEI to make it the exclusive recipient of retina referrals should it join the venture. Plaintiff claims that the letter independently established an intent to exclude RA and therefore to monopolize the market for retina patients. However

the record shows that Staman and FRI were reluctant to join BEI, that they left the venture after the first few months and that they desired to split the BEI referrals fifty-fifty with RA should they join the venture. This Court's finding that no illegal group boycott existed in conjunction with these facts permits no inference of a specific intent to monopolize.

Because no triable fact issue exists with respect to two of the three elements of the Section 2 claim, summary judgment should be granted for Staman and FRI.