Bob KREBSBACH, M.D., Appellant,

v.

William G. HENLEY, M.D., Robert R. Hillis, M.D., Phillip R. Harwell, M.D., John Doe and Jane Doe, Appellees.

No. 61248.

Supreme Court of Oklahoma.

Sept. 16, 1986.

Carson, Rayburn, Hirsch & Mueller by Karen A. Pepper Mueller, Oklahoma City, for appellant.

Short, Barnes, Wiggins, Margo & Adler by John Wiggins, Oklahoma City, for appellees.

LAVENDER, Justice:

Appellant, Bob Krebsbach, M.D., initiated this action against appellees, Drs. Wil-liam G. Henley, Robert R. Hillis and Phillip R. Harwell, alleging that appellees had slandered him, had interfered with his business relations, and had entered into a conspiracy to slander and interfere with his business relations. Appellees answered these allegations with a general denial.

The parties to this case engaged in substantial discovery. Numerous depositions of witnesses were taken as well as the depositional testimony of appellant. Interrogatories from appellant to appellee Hillis were answered. All of this material was filed of record in the case.

Following this discovery period both appellant and appellees presented the trial court with motions for summary judgment. The parties agreed that the facts of the case were not in controversy and that these facts supported the rendering of judgment. The only disagreement present in these motions concerned for whom they felt judgment should be rendered.

The trial court heard argument on the motions and took the matter under advisement. After consideration, the trial court sustained the motion of appellees and entered judgment in their favor. Appellant now challenges that ruling on the ground that the facts supported the rendition of judgment in his favor, or at least that the facts were in controversy so as to require submission to a jury.

It is the function of a summary judgment procedure to eliminate a useless trial where there is no conflicting evidence as to factual issues bearing significantly on the outcome of the case, and under these facts reasonable people could draw only a set of conclusions which would support judgment for one of the parties.[1] In ruling on a summary judgment motion all inferences and conclusions to be drawn from the underlying facts contained in the materials submitted in support of the motion must be viewed in the light most favorable to the party opposing the motion.[2] The materials

1. *Wilds v. Universal Resources Corp.,* 662 P.2d 303 (Okla.1983); *Martin v. Chapel, Wilkinson,* *Riggs and Abney,* 637 P.2d 81 (Okla.1981); *Loper v. Austin,* 596 P.2d 544 (Okla.1979).

2. *Ross v. City of Shawnee,* 683 P.2d 535 (Okla. 1984).

supplied to the trial court to support the motions of both appellant and appellees in this case consisted of the depositions taken and the one set of interrogatories. In reviewing the ruling by the trial court this Court will examine the evidentiary materials submitted, in conjunction with the pleadings, to determine what facts are material to the plaintiff's (appellant's) cause of action, and then determine whether there is a controversy as to a material fact or whether the uncontroverted facts support the trial court's ruling.[3]

The facts which may be drawn from the materials submitted with the motions for summary judgment present a long and complex background to this case.

It appears that appellant first came to the Lawton, Oklahoma, area as a doctor with the Public Health Service at the Indian Hospital located at Lawton. Appellant continued to work with the Indian Health Division for several years in the area but decided to leave the Public Health Service in 1978 over a dispute regarding his next duty assignment. Appellant chose at that time to enter private practice. At the time appellant left the Public Health Service he had achieved a specialty category as a pediatrician. Additionally, while working at the Indian Hospital, appellant did amass some experience in delivering babies. However, as stated in his deposition, appellant never felt comfortable dealing with difficult deliveries.

Upon leaving the Public Health Service appellant applied for privileges at Comanche County Memorial Hospital. Appellant's request for obstetrical privileges was denied, but his requests for pediatric and family practice privileges were granted. It appears that the denial of obstetrical privileges constituted a crucial link in the evolution of this case.

In his private practice appellant developed a reputation of being available to people of limited means and to women and families on welfare. However, since appellant did not have obstetrical privileges at Memorial Hospital, he could not deliver the children of his patients after seeing them prenatally. Instead, appellant would give his patients prenatal care and then send them to Memorial Hospital to be delivered by the doctor on call. This raised a great deal of contention in the medical community because appellant was not sending along any prenatal medical records with his pregnant patients. This created problems for the delivering doctor since he was not being made aware of the potential for problems with the birth.

Partially in response to this situation, the Lawton medical community instituted a prenatal medical care program through the Comanche County Health Department. Under this program care was provided to pregnant women who would not otherwise have been able to afford it. As part of the program the women agreed that when it was time for the delivery, the birth would be handled by one of the obstetricians participating in the program on call at Memorial Hospital and the baby would be checked out by the participating pediatrician on call. When this program was instituted appellant agreed to no longer furnish prenatal care. Appellant did not participate in the Health Department program.

About a year prior to appellant's agreement to terminate his delivery of prenatal care, appellees, practicing as Great Plains Women's Clinic, Inc., sent appellant a letter, the text of which read:

> The Physician members of the Great Plains Women's Clinic, Inc. have decided, at this time, to notify you of our intentions toward future referrals from you. We choose to refuse any future referrals from you to our office for either Gynecological or Obstetrical care.
>
> We also choose to accept no Obstetrical patients who will be using you as their Pediatrician. Lastly, we will be making no referrals to you.

The reasoning of appellee physicians in sending this letter was explained by appel-

lee Hillis in the answers to interrogatories. In response to a question as to why appellant would not have been called as a pediatrician for the care of a newborn child in the delivery of a walk-in patient at Memorial Hospital, appellee Hillis stated:

Finally, you have asked "why" Dr. Krebsbach would not have been called. Again, I answer this from my point of view. It is felt that the possible complications of delivery are such that I should be able to work hand and glove with a pediatrician in whom I have confidence and a certain degree of rapport. Frankly, I do not and did not have this with Dr. Krebsbach. It is my opinion that when a patient has had nine months of pregnancy to seek obstetrical and pediatric care, she has had ample opportunity to do so. Appearing at a hospital in labor, without records and with little or no information concerning the medical aspects of her pregnancy, I feel she puts the O.B. physician in a rather precarious position and if anything, heightens the necessity for working with a pediatrician in whom he has confidence and rapport should a complication develop.

Appellant's problems with Comanche County Memorial Hospital continued and eventually culminated in the suspension of all of appellant's hospital privileges, and, following a chart review of some twenty patients admitted by appellant conducted by an ad hoc committee of physicians from the Oklahoma State Medical Association, appellant was dismissed from the hospital staff. Following this dismissal, and a termination of hospital privileges at Southwestern Hospital, appellant left the Lawton area to establish a practice in Nebraska.

### I.

The theory of recovery pled by appellant which we shall address first is that alleging that appellees had slandered appellant. As stated in his brief on appeal, the foundation for this theory lay in appellant's assertion that:

As stated to the trial court below, the slanderous statements complained of and alleged in [this case] were that Defendants falsely stated to patients admitted to Comanche County Memorial Hospital for delivery, that Plaintiff was no longer associated with Comanche County Memorial Hospital when, in fact, he was. Defendants further told patients that the delivering physician would assign the newborn to a staff pediatrician rather than to the Plaintiff *even when the patient specifically requested Plaintiff care for her newborn.* Other slanderous statements were that Defendants told Plaintiff's patients that if they wished Plaintiff to treat their newborns they could not deliver their newborns at Comanche County Memorial Hospital.... (emphasis original)

The evidentiary materials in this case are utterly devoid of any indication that appellees ever stated to anyone that appellant was no longer associated with Memorial Hospital. What the evidence does indicate is that certain nurses told women participating in the prenatal care program through the County Health Department that the women had to abide by the agreement they made when they entered the program; that they would be delivered by a participating obstetrician and the newborn would be seen by a participating pediatrician. Since appellant was not a participant in this program the nurses told these patients that appellant was not an available choice.

The "other slanderous statements" alleged by appellant stem from appellees' decision not be involved in the treatment of any patient who chose to use the services of appellant as a pediatrician. The evidentiary materials indicate that appellees informed patients seeking their obstetrical services that they had chosen not to associate with appellant and that, if the patient insisted on using appellant's services as a pediatrician, the patient would have to secure obstetrical services elsewhere.

As to the allegations concerning appellant's association, or lack thereof, with Memorial Hospital, the evidence before the trial court totally fails to support appel-

lant's argument. The statements which were made by the nurses, even if they might possibly be considered supportive of appellant's assertions, were not shown to have any connection to appellees in this case.

Appellees' statements that they did not care to associate professionally with appellant also do not support appellant's pled cause of action. Appellant asserts that these statements constituted slander per se in that they tended directly to impute a general disqualification to practice his profession.[4]

■ A publication is actionable per se only when the language used is susceptible of but one meaning, and that an opprobrious one.[5] In this case the language used stated only that appellees did not care to work with appellant. This language has no overt opprobrious connotations. Any defamatory meaning coming from these statements had to come in the form of insinuation from the language. This places the allegation in the realm of slander per quod.

■ Appellant argues that if the slander is per quod rather than per se, his cause of action is saved by his allegation of special damages. While this statement might be appropriate if a demurrer to the petition were at issue, it is not applicable in the review of a grant of summary judgment. At issue here is whether the evidentiary materials before the trial court support the conclusion that appellant suffered special damages. We find that they do not.

As established by the depositional testimony, appellant's income actually increased following the alleged slanderous actions until the time appellant left Lawton. Appellant did not offer any proof to support his assertion that he had lost patients as a result of the statements made by appellees. On the contrary, the only depositional testimony directly concerning these statements

came from a woman who had been refused obstetrical care by appellees because of her insistence on using appellant as a pediatrician. This woman testified that she continued to use appellant's services at the time her deposition was taken. The failure of the uncontroverted facts before the trial court to give rise to an inference that appellant had suffered special damages from the statements of appellees was fatal to his alleged cause of action.[6]

## II.

We next address appellant's asserted theory of recovery based on the proposition that appellees had wrongfully interfered with appellant's business relations. As the basis for this proposition appellant relies on the same facts as for his slander theory; i.e. the refusal to allow appellant to serve as the pediatrician for women delivered under the County Health Department program, and the refusal of appellees to associate professionally with appellant.

Appellant relies on this Court's language from the case of *Crystal Gas Co. v. Oklahoma Natural Gas Co.,*[7] for the existence of his right to recover under this theory:

We have previously held that one has the right to carry on and prosecute a lawful business in which he is engaged without unlawful molestation or unjustified interference from any person, and any malicious interference with such business is an unlawful act and an actionable wrong. However, we have held plaintiff must establish the defendant's wrongful acts were the proximate cause of plaintiff's injury. (citations omitted)

It is apparently appellant's argument that it was wrongful for appellees, as obstetricians, to refuse in any way to associate professionally with appellant. Appellant argues that this refusal constituted a restraint of trade in violation of 79 O.S.

---

4. See 12 O.S.1981 § 1442.

5. *Gentry v. Wagoner County Publishing Co.,* 351 P.2d 718 (Okla.1960).

6. See *Haynes v. Alverno Heights Hospital,* 515 P.2d 568 (Okla.1973) (dealing with publication of writing rather than spoken statements).

7. 529 P.2d 987, 989 (Okla.1974).

1981 § 1.[8] In interpreting this provision this Court has stated: [9]

It has long been recognized that every agreement concerning trade, and every regulation of trade, restrains trade to some extent, and that the very essence of such agreements is to bind or restrain. As a literal application of the provisions of 15 U.S.C., § 1, or 79 O.S.1971, § 1, would outlaw every conceivable contract or combination which could be made concerning trade or commerce, courts have read into such statute a "rule of reason", under which only those acts, contracts, agreements, or combinations which prejudice public interest by unduly restricting competition, or unduly obstructing the due course of trade, or which injuriously restrain trade, are unlawful.

Thus, only unreasonable restraint of trade, as measured by the "rule of reason", constitutes a violation of 79 O.S., § 1. However, certain restraints of trade, because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and, therefore, per se violations. (footnotes omitted)

The situation which presents itself here involves the choice of a physician to work or not work with another physician in the care of a patient. In effect we have a group of physicians, appellees, electing not to work on any patients in conjunction with appellant. This election had two manifestations; the presentation of an either/or choice to those patients seeking obstetrical care through Great Plains Women's Clinic, and the contractual arrangements made with patients seeking care through the Health Department program. In either instance the underlying concern of appellees as reflected in the materials in this case lay in their perception of medical ethics. As stated by appellee Hillis, "the possible complications of delivery are such that [the obstetrician] should be able to work hand in glove with a pediatrician in whom [the obstetrician] [has] confidence and a certain degree of rapport." Appellees thus engaged in actions which insured that they only worked with other physicians in whom they had confidence.

■ In the case of *Pontius v. Children's Hospital,*[10] the court addressed a case involving an alleged restraint of trade under 15 U.S.C. § 1, which included, among other points, a claim that the refusal of certain defendant physicians to refer patients to the plaintiff physician constituted a group boycott actionable as a per se restraint of trade. In this regard the court stated: [11]

In the area of physician referrals and staffing decisions it is obvious that behavior which might, in a normal commercial sphere, be considered a group boycott subject to the per se rules of illegality may well be dictated by "public service and ethical norms." We are simply not prepared to hold that a group of physicians who decide that they do not want to refer patients to a particular surgeon, because they doubt his qualifications, have committed a per se violation of the Sherman Act. Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for the patients' well-being, we hold that such behavior, in the medical service industry, should be analyzed in terms of the rule of reason.

Appellant has attempted to distinguish the *Pontius* case by pointing out that his petition alleges interference with business relations rather than a restraint of trade under 15 U.S.C. § 1. We find this proffered distinction to be entirely specious. Appellant has argued that the actions of appellees were wrongful because they were

---

**8.** 79 O.S.1981 § 1, states:

Every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.

**9.** *Teleco, Inc. v. Ford Industries, Inc.,* 587 P.2d 1360, 1362, 1363 (Okla.1978).

**10.** 552 F.Supp. 1352 (W.D.Pa.1982).

**11.** Id. at 1369, 1370.

in violation of 79 O.S.1981 § 1.[12] We have previously acknowledged the analogous relationship of 15 U.S.C. § 1 and 79 O.S.1981 § 1,[13] as well as the applicability of the rule of reason analysis to cases arising under 79 O.S.1981 § 1.[14] We find the reasoning of the court in *Pontius* to be persuasive as to the applicability of the rule of reason analysis to the present case.

Additionally, since the very essence of an action for interference with business relations is that the interference be unlawful or unjustified,[15] we find the rule of reason analysis to be pointedly justified in analyzing appellees' actions.

■ In this case all parties testifying by way of depositions agreed that medical ethics justified, and in fact mandated, the refusal of appellees to work with appellant on patients when they did not feel confident of appellant's abilities. The facts presented in this case clearly support a finding that this concern was justified. The facts do not provide any justifiable linkage to appellant's assertion that the action was in retaliation for appellant's anti-abortion activities.[16]

■ The fundamental test of the reasonableness of an action, which, by its nature, restrains trade, is its effect on the public.[17] The action of appellees here was mandated by a set of ethics designed to protect that public. Though the effect of appellees' action was, to a slight extent, a restraint on the trade available to appellant, we find that action to be reasonable under the circumstances given.

Further, no adverse effect upon the public has been demonstrated by appellant to have occurred as a result of the restraint. Appellant's assertion that his services were less costly than other physicians does not establish such an adverse effect. It is clear that obstetrical and pediatric care were available to those with limited funds through the Health Department programs, and there were obstetricians other than appellees to whom appellant could have referred his patients after appellees made known their refusal to work with him further.[18]

The evidence before the trial court fails to give rise to any inference to support the claimed violation of 79 O.S.1981 § 1. Appellees' actions must be viewed under a rule of reason analysis. When so viewed they appear to further rather than impair the interests of the public. Appellant has also failed to present any evidence to estab-

---

**12.** Appellant also argues that appellees' acts of informing patients at Memorial Hospital that appellant "no longer worked at the Hospital," were wrongful and an interference with appellant's business relationships. As discussed in Section I of this opinion, the evidence presented to the trial court wholly fails to connect appellees to any such statements.

**13.** See *Young v. Seaway Pipeline, Inc.,* 576 P.2d 1148, 1150 (Okla.1977); *Board of Regents v. NCAA,* 561 P.2d 499, 505 (Okla.1977).

**14.** *Crown Paint Co. v. Bankston,* 640 P.2d 948 (Okla.1981), cert. den. 455 U.S. 946, 102 S.Ct. 1444, 71 L.Ed.2d 659; *Teleco, Inc. v. Ford Industries, Inc.,* supra note 9.

**15.** *Crystal Gas Co. v. Oklahoma Natural Gas Co.,* supra at note 7.

**16.** See *Loper v. Austin,* supra note 1, (the mere contention that facts exist is not sufficient to withstand summary judgment.)

**17.** *Board of Regents v. NCAA,* supra note 13.

**18.** In the case of *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir.1978), cert. den. 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494, the court stated:

"Section 1 of the Sherman Act is concerned with restraints on competition, and the competition with which the Act is concerned is more than that contributed by the plaintiff. To amount to an unreasonable restraint of trade the anticompetitive conduct must have an effect greater than its effect upon the plaintiff's business. See, e.g., *Mutual Fund Investors, v. Putnam Management Co.,* supra, 553 F.2d [620] at 627. As it has often been stated, "the antitrust laws * * * were enacted for 'the protection of competition, not competitors * * *.'" *Brunswich Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697 [50 L.Ed.2d 701] (1977). The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged...."

Accord, *Board of Regents v. NCAA,* supra note 13.

lish a detriment to the public of the nature our antitrust legislation was intended to prevent.

As the evidence fails to support an inference that appellees' actions constituted an unlawful restraint of trade, it also fails to support any other inference which would establish that their actions in refusing to work in conjunction with appellant were in any way wrongful. Accordingly the trial court's action in granting summary judgment on this point was proper.

## III.

Finally, we address appellant's theory that he should recover in this case because of the conspiracy which he alleges had existed between appellees. Appellant states that the purpose of the conspiracy was to ruin his business and to drive him from the Lawton medical community. The way this conspiracy functioned, as alleged by appellant, was through the previously mentioned slanders and the interference with appellant's business relationships.

As proof of this conspiracy appellant offered: 1) that he had taken part in anti-abortion activities, which he alleged were unpopular with appellees; and 2) that he was in fact forced to leave the Lawton medical community. In addition to these two circumstances appellant offered the testimony of one other physician, Dr. S., who had also taken part in the anti-abortion demonstrations, who testified that he was sure appellee Hillis was involved in the revocation of appellant's privileges at Southwestern Hospital. Other than this statement Dr. S.'s entire testimony concerned vague allegations that an unidentified "they" were out to get appellant.

In the case of *Dill v. Rader*,[19] this Court stated:

In *Nissen v. Andres*, 178 Okl. 469, 63 P.2d 47 (1936), this Court affirmed the trial court's sustaining of the defendant's demurrer to the evidence in a conspiracy case. In affirming the trial court's sustaining of the demurrer to the evidence,

we held that the plaintiff had not made out a prima facie case. In discussing plaintiff's burden of proof, we stated:

" * * * we search the record now for evidence which may be said to support the charge of conspiracy. There is here no direct evidence of a conspiracy. It is permissible, however, to prove a conspiracy by circumstantial evidence. We find apt statements of the law in this regard in *Chisler v. Randall et al.*, 124 Kan. 278, 259 P. 687, wherein the court said: 'In order to prove a conspiracy by circumstantial evidence, there must be substantial proof of circumstances from which it necessarily follows, or at least may be reasonably inferred, that the conspiracy existed. It cannot be established by conjecture and speculation alone.' "

The Supreme Court of Illinois in *Tribune Co. v. Thompson*, 342 Ill. 503, 174 N.E. 561, 571, in dealing with the law uses the following language:

'In analyzing the evidence with respect to the alleged conspiracy, certain fundamental rules of law applicable to this case must be pointed out. It first must be noted that the burden of proof is upon the complainant to prove the appellants guilty of conspiracy, as charged in the bill of complaint, by clear and convincing evidence. * * * There is no direct evidence in this case to prove the conspiracy, and while conspiracy may be proved by indirect or circumstantial evidence, such evidence must be clear and convincing, and if the facts and circumstances relied upon are as consistent with innocence as with guilt, it is the duty of the court to find that the conspiracy has not been proved * * * ' [Citations omitted]

■ The evidence presented by appellant to support the existence of the conspiracy consisted of the alleged motive, the end result, and the wrongful actions discussed in sections I and II of this opinion, which were allegedly the means by which the

19. 583 P.2d 496, 498, 499 (Okla.1978).

result was accomplished. This was the record before the trial court upon consideration of the motion for summary judgment.[20] As in a ruling on a demurrer to the evidence a trial court in ruling on a summary judgment motion determines the issue of whether there has been evidence presented on a question of fact to support presenting that question to a jury.[21]

In *Dill*,[22] this Court went on to say:

Under the statement of the law quoted above, in order to make out a prima facie case of conspiracy, the evidence must be (1) *clear and convincing* and (2) such evidence must *do more than raise suspicion*—it must *lead to belief.* The rules of law set forth above also provide that disconnected circumstances, any of which, or all of which, are just as consistent with lawful purposes as with unlawful purposes, are insufficient to establish a conspiracy. (emphasis original)

Thus, if the evidence presented by appellant was insufficient to give rise to a prima facie case of conspiracy the trial court acted properly in granting summary judgment on the issue. In this case we have already examined the trial court's rulings on the alleged means by which the conspiracy supposedly operated. We have determined that the allegations of slander were unfounded, as the evidence either wholly failed to connect appellees to any statement alleged to be slanderous, or failed to show that appellant was damaged by any alleged statement. Likewise we have found that the actions which appellant argued constituted an interference with his business relations were not wrongful. There only remains for consideration the evidence presented regarding the alleged motive and the end result. The evidence in this regard was not controverted. Appellees have not challenged the fact that appellant engaged in anti-abortion activities or that appellant left town after losing privileges at both Lawton hospitals. The question then was whether these facts could support the finding of the existence of a conspiracy.

■　The only facts presented which connected appellees to these events were statements attributed to them to the effect that they did not consider appellant's activities in demonstrating against abortions to be professional, and the assertion that appellee Hillis was on the committee which revoked appellant's privileges at Southwestern Hospital. Applying the rules stated in *Dill*, we agree with the trial court's ruling that the circumstantial facts presented were insufficient to establish a conspiracy among appellees. Accordingly, the ruling of the trial court as to this point is also affirmed.

## IV.

The trial court's grant of summary judgment to appellees in this case is in all respects AFFIRMED.

SIMMS, C.J., and HODGES, HARGRAVE, KAUGER and SUMMERS, JJ., concur.

OPALA, J., concurs in judgment.

WILSON, J., concurs in Part I, dissents as to II and III.

DOOLIN, V.C.J., disqualified.

---

**20.** See *Wabaunsee v. Harris,* 610 P.2d 782 (Okla. 1980) (ruling is to be made on the record actually presented and not what is potentially possible.)

**21.** See *Loper v. Austin,* supra note 1, (summary judgment is procedure designed to determine if there is conflicting evidence on a question of fact. Every question decided under summary judgment rule is normally a jury question.)

**22.** 583 P.2d at 499.