2001 OK 1

Lee W. BEVILLE, M.D.,
Plaintiff/Appellant,

v.

Randy L. CURRY, Comanche County Hospital Authority, d/b/a Comanche County Memorial Hospital, First Health West, a trust, Robert Jones, M.D., Randy Segler, Patti Davis, Charles H. Greene, Jr., Herb Stonehocker, Martha Lou Lawson, Donald S. Bentley, Shon Erwin, and Urbane Skinner, Defendants/Appellees.

No. 88330.

Supreme Court of Oklahoma.

Jan. 16, 2001.

Rehearing Granted in Part Oct. 9, 2001.

As Corrected Jan. 22, 2001.

Frank A. Gregory, Oklahoma City, OK, for Plaintiff/Appellant.

D. Kent Myers, Joseph J. Ferretti, Crowe & Dunlevy, Oklahoma City, OK, A. Scott Johnson, Brent L. Thompson, Johnson, & Hanan, P.C., Oklahoma City, OK, and James William Connor, Jr., Richards & Connor, Tulsa, OK, for Defendants/Appellees.

HARGRAVE, C.J.

¶ 1 Plaintiff, a radiologist in Elk City, brought an antitrust action under 79 O.S. 1991 § 25 for alleged violations of sections 1, 2, 3 and 4 of the Oklahoma Anti–Trust Act[1] against Comanche County Health Authority,

d/b/a Comanche County Memorial Hospital (CCMH), its administrator Randy Curry, its trustees, First Health West, a consortium of hospitals in a multi-county area, and its trustees. The defendants will be referred to collectively, for the sake of convenience. The trial judge granted summary judgment to the defendants. The Court of Civil Appeals affirmed in part and reversed in part. We granted certiorari. We affirm the trial court's grant of summary judgment because the plaintiff failed to demonstrate injury to competition, the evidentiary materials fail to support his claim, and he failed to refute the defendants' prima facie showing of lack of market power. Plaintiff's motion for oral argument is denied.

¶ 2 Plaintiff's first claim, asserted against defendants Curry and CCMH, alleged that agreements between the defendants were illegal combinations and conspiracies in restraint of trade and that plaintiff was injured in his business and property by being denied the ability to obtain income that he might have been able to earn otherwise, and the opportunity to pursue his selected profession free of "illegal artificial interference." Plaintiff's second claim, asserted against defendants Curry and CCMH, alleged that the business practices, including the prices charged by CCMH's contract physicians, are under the control of defendants CCMH and Curry and that they are thus a "single seller" as described by laws relating to price discrimination. Plaintiff alleges that the defendants have willfully and illegally discriminated in price between different regions of the state in providing like medical services and engaged in those practices for the specific purpose of injuring and disciplining non-CCMH physicians and preventing competition, and that such illegal discrimination is in violation of 79 O.S.1991 § 2. Plaintiff's third

---

1. The statues under which this action was brought, Combinations in Restraint of Trade and Unfair Discrimination or Competition, 79 O.S. 1991 § 1 et. seq., were repealed by Laws 1998, c. 356 § 14 and replaced by the Oklahoma Antitrust Reform Act, 79 O.S. Supp.1998 § 201 et seq., Laws 1998, c. 356 § 1, effective July 1, 1998. Section 203 of the Oklahoma Antitrust Reform Act defines "monopolize" as: "[T]he possession of monopoly power in the relevant market, and the wilful acquisition or mainte-

nance of that power by exclusionary conduct as distinguished from growth or development as a consequence of a superior product and or service, business acumen or historic accident." 79 O.S. Supp.1998 § 203D(1)(a)(b). Monopoly power is defined as the power to control market prices or exclude competition. § 203(2). Section 212 states that the Act shall be interpreted in a manner consistent with federal antitrust law, 15 U.S.C. section 1, et seq., and the case law applicable thereto.

claim, asserted against all the defendants, was that the defendants had formed agreements, combinations and conspiracies that unreasonably restrained trade and competition in the market in violation of 79 O.S. §§ 1 and 3, which actions injured plaintiff in his business and property. The fourth claim, asserted against defendant CCMH, was that CCMH is a public business and is under a duty to provide adequate services to all members of the public, upon reasonable terms and without discrimination and that defendants actions violated 79 O.S.1991 § 4.

¶ 3 Plaintiff alleged that these actions resulted in his losing the opportunity to establish a teleradiology network and also caused him to lose radiology business through reduced referrals and equal access. He sought treble damages, injunctive relief, attorney fees and costs. The trial court dismissed plaintiff's teleradiology claim, on defendants' motion, due to lack of standing, because neither plaintiff nor defendants had a teleradiology network in existence, and plaintiff could not show that he had suffered any damages.

¶ 4 Defendants moved for summary judgment on the grounds that: 1) they lacked the market power required for any monopoly claim; 2) there were no facts to support a claim under 79 O.S. § 2 and § 3; 3) the section 3 claim was baseless in law because no products were involved; 4) the section 4 claim was not viable because defendants are neither a utility nor a utility-like entity.

¶ 5 The trial court granted defendants' motions for summary judgment, without specifying the reasons for the ruling. From the record, it is evident that the defendants' lack of market power was deemed to be the controlling issue in the case. The Court of Civil Appeals affirmed the finding of defendants' lack of market power, but reversed in part, believing that the plaintiff may have had a conspiracy claim, and reversed the trial court's ruling on dismissal of the teleradiology claim. We granted certiorari.

¶ 6 The following facts are taken from plaintiff's deposition, which was listed as an exhibit to plaintiff's brief in opposition to defendants' motion for summary judgment. Plaintiff was considering establishing a medical practice in southwestern Oklahoma and he began to research the possibilities there. He concluded that the area might be ripe for a teleradiology[2] network and for mobile radiology because it appeared that there were no facilities outside of Lawton. In March 1993, plaintiff interviewed with a radiology group in Lawton. During that interview, he was introduced to some of the other doctors practicing at Comanche County Memorial Hospital (CCMH) and met with the hospital's administrator, Mr. Randy Curry. Although he did not mention his hopes about the teleradiology network and mobile radiology to the radiology group with whom he was interviewing, during his visit with Mr. Curry, he saw a teleradiology map on the wall and mentioned to Mr. Curry his desire to create a network and to provide mobile services. The plaintiff was not hired by the radiology group in Lawton, and believes that Randy Curry "told them not to" hire him. Although plaintiff was offered a contract to provide radiology services and set up a teleradiology network at another Lawton hospital, he did not accept it.

¶ 7 The plaintiff took a job in Muskogee from September 1993 to June 1994. While living in Muskogee, plaintiff explored the possibility of establishing a teleradiology network in eastern Oklahoma, but learned that the State of Oklahoma was planning to establish a statewide teleradiology network. The plaintiff took over a practice in Elk City, Oklahoma in June 1994 and began to provide radiology services to the hospital there through his solely-owned corporation, Southwest Imaging Services. At that point, neither the State of Oklahoma network nor the CCMH teleradiology network was in existence, nor was there one at the time of plaintiff's deposition. Plaintiff contacted some of the administrators of other area hospitals about obtaining radiology business for himself. This search revealed that many of the towns already were being provided with radiology services, and that some of

2. Plaintiff in his affidavit defines "teleradiology" as a method of practicing radiology from afar when either a patient or an X–Ray is submitted to him for interpretation and the patient or the X–Ray comes from a distance.

them had their own equipment, which would not make them a candidate for mobile radiology. At least two cities, Hollis and Frederick, were being served by existing teleradiology services and others, such as Cheyenne and Mangum, intended to join the State of Oklahoma network, which would be free to them for the first two years. Elkview Hospital in Hobart told plaintiff that they were a member of First Health West and were going to use their teleradiology system. Doctors in Clinton were prepared to set up a teleradiolgy system with Baptist Hospital in Oklahoma City, and plaintiff was unsure whether that was a part of the State of Oklahoma teleradiology network (OTN). The two radiologists who were providing full services to the hospital in Altus did not feel that they needed teleradiology for their practice. Southwest Hospital in Lawton already had a working teleradiology system.

¶ 8 Plaintiff did not have a mobile radiology program or a teleradiology network to offer at the time his lawsuit was filed. He had made no written proposals to anyone about establishing a mobile radiology or teleradiology network. The trial court dismissed plaintiff's teleradiology claim based on lack of standing because he did not have a teleradiology network that had been harmed by defendants. Although the trial court dismissed the claim on the basis that the plaintiff lacked standing, it is clear that the trial court believed that plaintiff could not establish harm to a non-existent teleradiology network, particularly since the defendants did not have a teleradiology network either.[3]

¶ 9 It has been held that a trial court properly granted summary judgment where plaintiff could not recover on a claim that defendants' action prevented him from purchasing a bakery facility where plaintiff failed to show sufficient preparedness to enter a baking business and failed to demonstrate his own ability to secure financing that would have been necessary to purchase the facility. *Curtis v. Campbell–Taggart, Inc.,* 687 F.2d 336 (10th Cir.1982), *cert. den.* 459 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937; *reh. den.* 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472. The plaintiff in *Campbell–Taggart* had not shown the consummation of contracts toward purchase of the business and the court said, "[A]lthough Mr. Curtis certainly has manifested an intention to enter the baking business, we agree with the district court that he has failed to show sufficient preparedness to raise a genuine issue of fact under these standards." *See also, Paddington Corp. v. Major Brands, Inc.,* 359 F.Supp. 1244 (W.D.Okla.1973) (plaintiff had never attempted to purchase scotch whisky from distiller or from importer and did not have standing to complain of distiller's alleged refusal to deal with others than importer). In the case at bar, neither the plaintiff nor the defendants had a teleradiology business. We affirm the trial court's ruling dismissing the teleradiology claim.

## STANDARD OF REVIEW

¶ 10 The appellate standard of review on a grant of summary judgment is de novo. We said in *Hoyt v. Miller,* 1996 OK 80, 921 P.2d 350, 351:

"Although a trial court in making a decision on whether summary judgment is appropriate considers factual matters, the ultimate decision turns on purely legal determinations, i.e. whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions. Therefore, as the decision involves purely legal determinations, the appellate standard of review of a trial court's grant of summary judgment is de novo."

We will, like the trial court, examine the pleadings and evidentiary materials submitted by the parties to determine if there is a genuine issue of material fact. *Ross v. City*

---

3. Plaintiff claimed that, but for defendants' actions, he could have established a teleradiology network, but he failed to indicate any actions on the part of defendants that prevented him from establishing a teleradiology network. Plaintiff attached a copy of CCMH's June 4 prospectus for a teleradiology network in which CCMH refers to the Oklahoma Teleradiology or Telemedicine Network operating from the University of Oklahoma that would provide services to small hospitals that those hospitals would be unable to provide for themselves. CCMH foresaw itself a "hub" of such network, serving eight other hospitals in the area.

*of Shawnee,* 1984 OK 43, 683 P.2d 535, 536. All inferences and conclusions to be drawn from the evidentiary materials must be viewed in the light most favorable to the non-moving party. *Id.* If the materials subject to consideration on a motion for summary judgment disclose controverted material facts or that reasonable minds might reach different conclusions even if the material facts are undisputed, a motion for summary judgment should be denied. *Perry v. Green,* 1970 OK 70, 468 P.2d 483, 488–489.

¶ 11 The provisions of this state's antitrust statutes are similar to federal legislation, and interpretation of federal antitrust legislation provides assistance in interpreting the provisions of the Oklahoma statutes. *Teleco, Inc. v. Ford Industries, Inc.,* 1978 OK 159, 587 P.2d 1360, 1362. The plaintiff alleges that a defendant is a public entity and that it's daily operations are against public policy and done in an illegal manner. This Court may resolve a public policy issue that was neither advanced below nor on appeal. *Davis v. GHS Health Maintenance Organization, Inc.,* 2001 OK 3, 22 P.3d 1204, 1212; *First Federal Savings & Loan v. Nath,* 1992 OK 129, n. 35, 839 P.2d 1336, 1343. Whether the hospital's daily operations are against public policy presents a controversy that this Court may resolve on a theroy not intended on certiorari but supported by the record. *Russell v. Board of County Commissioners, Carter County,* 1997 OK 80, ¶ 10, 952 P.2d 492, 497.

## ANTITRUST CLAIMS

¶ 12 Our analysis must proceed under the "rule of reason," which prohibits restraints only if the adverse effects on overall competition outweigh the pro-competitive benefits of the restraint. *See, National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). In *Krebsbach v. Henley,* 1986 OK 58, 725 P.2d 852, 857, we said:

"It has long been recognized that every agreement concerning trade, and every regulation of trade, restrains trade to some extent and that the very essence of such agreements is to bind or restrain. As a literal application of the provisions of 15 U.S.C. § 1 or 79 O.S.1971 § 1 would outlaw every conceivable contract or combination which could be made concerning trade or commerce, courts have read into such statute a 'rule of reason' under which only those acts, contract, agreements or combinations which prejudice public interest by unduly restricting competition or unduly obstructing the due course of trade, or which injuriously restrain trade, are unlawful. Thus, only *unreasonable restraint of trade,* as measured by the 'rule of reason' constitutes a violation of 79 O.S. § 1. However certain restraints of trade, because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and, therefore, per se violations." (emphasis added).

*Accord, Teleco, Inc. v. Ford Industries, Inc.,* 1978 OK 159, 587 P.2d 1360, 1363 (using the "rule of reason" analysis for monopoly or antitrust claims). Under the "rule of reason" only those acts, contracts, agreements or combinations which prejudice the public interest by unduly restricting competition, or unduly obstructing the due course of trade, or which injuriously restrain trade, are unlawful.

¶ 13 Oklahoma's antitrust act, or mini-Sherman Act, applicable to this matter appeared at 79 O.S.1991 §§ 1 et seq.[4] The

---

4. § 1. Trust In Restraint Of Trade Illegal.
   Every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.
   § 2. Discriminations In Buying And Selling Commodities Unlawful.
   It shall be unlawful for any person, firm, corporation or association, engaged in the production, manufacture, distribution, purchase or sale, of any commodity of general use, or rendering any service to the public or engaged in the sale or furnishing of advertising or advertising service or space for advertisements in publications thereof, to directly or indirectly, either in person or by or through any agent or representative, discriminate between different persons, firms, associations or corporations, or between different sections, communities or cities of the state;
   (B) By selling such commodities, or rendering such service, or by selling or furnishing such advertising or advertising service or space for

*sine qua non* of an antitrust claim is injury to competition. In order to prove an anticompetitive effect on the market, the a plaintiff may prove either 1) the potential for genuine adverse affect on competition by possession of sufficient market power in the relevant market, or 2) evidence of actual detrimental effects on competition. *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir.1996), *cert. den.* 519 U.S. 820, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996), citing *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Market power is the preliminary threshold inquiry and is often dispositive of antitrust cases. *See, SCFC ILC, Inc. v. Visa U.S.A., Inc.*, 36 F.3d 958, 965 (10th Cir.1994), *cert. den. sub nom, MountainWest Financial Corp. v. Visa U.S.A., Inc.*, 515 U.S. 1152, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995). Plaintiff must, to prove the potential for genuine adverse effects on competition, define the relevant market and establish that the defendant possessed market power. *Federal Trade Com'n. v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). In *Levine, supra,* at 1553, the court said that even if Dr. Levine had adequately defined the relevant market, he presented no evidence to prove the defendants' market power and that "[a]bsent evidence that the defendants had sufficient market power to affect competition, Dr. Levine' section 1 claims must fail."

¶ 14 As proof of their lack of market power, defendants in the case at bar submitted, as expert evidentiary material, a report from Margaret E. Guerin–Calvert, an economist from Washington D.C. specializing in antitrust economics and applied micro-economics. Ms. Guerin–Calvert's uncontroverted report showed that defendants' market share, regardless of the method used to calculate it, was as little as 14.2%, using plaintiff's largest-defined market, or at most 28.2%, using plaintiff's smallest-defined market.

¶ 15 Defendants argued on summary judgment that "market power" is presumed not to exist where the defendant possessed or controlled 35% of the relevant market. The presumption is that, as a matter of law, the defendants do not have sufficient market share to harm competition if their market share is less than 35%. Defendant demonstrated through their expert that regardless of the measurement used, defendants had less than 35% of the market share and thus lacked the requisite "market power" as a matter of law. Defendants' expert's affidavit also assessed the market based upon the Herfindahl–Hirschman Index used by the Federal Trade Commission and the Justice Department as indicators of probable market power in making the decision whether to institute civil proceedings. An HH index

advertisements in publication thereof, at a lower price or rate to one person, firm, copartnership, corporation or association than to another, if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition or restraining trade, or to destroy the competition of any regular established dealer in such commodity or to prevent the competition of any person who in good faith intends and attempts to become such a dealer, or to destroy the competition of any person, firm, copartnership, corporation, or association who is engaged in furnishing such service, or in the sale or furnishing of such advertising, advertising service or space for advertisements in publications thereof;
(C) By buying such commodity at a higher price in one section, community or city than another, after making due allowance for the difference, if any, in the grade, quantity or quality of the commodity and in the actual cost of its transportation from the point of purchase to the point where such commodity is to be

sold by the purchaser, or to be consumed, or to be used in the manufacture of commodities or products, if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition or restraining trade, or to destroy the competition of any regular established dealer in such commodity or to prevent the competition of any person who, in good faith, intends or attempts to become such dealer;
(D) By buying such commodity in any section, community, or city of the state at a higher price from one person, firm, corporation or association than from another, after making due allowance for the difference, if any, in the grade, quantity or quality of such commodity, if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition or restraining trade, or to destroy the competition of any regular established dealer in such commodity or to prevent the competition of any person who, in good faith, intends and attempts to become such a dealer.

number of 1800 is the standard above which there is a presumption that market power exists. The report stated that an HH index number below 1800 indicates lack of market power and the government presumes that lack of power in decisions not to prosecute. The HH index number calculated by Ms. Guerin Calvert in the case at bar was 765.

¶ 16 Rather than being responsive to defendants' motion for summary judgment, plaintiff filed a motion to compel discovery and first supplemental response and objection to summary judgment. Plaintiff first argued that if he could have more discovery, he might be able to establish some of his claims. In response to defendants' motion for summary judgment, plaintiff submitted certain written materials. Plaintiff proffered an affidavit from a CPA that attempted to counter defendants' expert by stating that those calculations involved only the practice of general radiology, not teleradiology and mobile van radiology. The expert stated that plaintiff was seeking to recover only on teleradiology and mobile van radiology, and not for general radiology. Thus, plaintiff's expert believed that the number of hospitals in the market area was irrelevant. Plaintiff, however, had pled the relevant market in his petition as "the market for radiology services" and listed fifteen counties in western Oklahoma.

¶ 17 Defendants showed that they lacked market power in the relevant market defined by the plaintiff. Plaintiff's evidentiary material failed to controvert defendants' prima facie showing of lack of market power in the relevant market. Plaintiff neither pled nor proved that defendants had market power in the plaintiff-designated geographic market. Both parties admitted that the product market was radiology, including teleradiology. There was no dispute between the parties as to the fifteen counties listed in plaintiff's petition as the relevant geographic market. In his deposition, plaintiff indicated that the relevant market was much broader, including some counties in Texas where the plaintiff is also licensed to practice.

¶ 18 Plaintiff's best-case scenario is that FHW/CCMH control 28.2% of the limited market specified in his petition. Plaintiff later expanded his relevant market to include a larger geographic area, and in which defendants' expert established that defendants' market share was 14.2%. Courts have refused to impose anti-trust liability upon showings of market power of 50.1% (dropping to 40.9% in the ten years of its existence) in *U.S. v. U.S. Steel Corp.*, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920); 36% in *United States v. Eastman Kodak Co.*, 853 F.Supp. 1454 (W.D.N.Y.1994), *aff'd*, 63 F.3d 95 (2nd Cir.1995); 30% in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), 30% in *American Floral Services v. Florists' Transworld Delivery Assn.*, 633 F.Supp. 201 (N.D.Ill.1986) and 25% in *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir.1993). Plaintiff failed to controvert defendants' evidentiary materials establishing that defendants lacked market power in the market defined by the plaintiff. Something more than conclusory allegations must be presented in order to withstand summary judgment. *F.B. Leopold Co., Inc. v. Roberts Filter Manufacturing Co., Inc.*, 882 F.Supp. 433 (W.D.Pa.1995), *aff'd. by unpublished opinion*, 119 F.3d 15.

■ ¶ 19 Further, plaintiff failed to show any antitrust injury or injury to competition. In medical antitrust cases, an exclusive referral agreement has been held not to constitute a horizontal concerted refusal-to-deal or group boycott in violation of Section 1 of the Sherman Act nor an "attempt to monopolize" in violation of § 2 of the Sherman Act. *Retina Associates, P.A. v. Southern Baptist Hospital of Florida, Inc.*, 105 F.3d 1376 (11th Cir.1997). The 11th Circuit said that even assuming that the alleged conduct constituted an agreement among several individuals to refer retina cases solely to FRI, and thereby refuse to deal with Retina Associates, Retina Associates still had to establish that the agreement unreasonably restrained competition. 105 F.3d at 1380. The court noted that, in an effort to contain costs and enhance the competitive ability of the network, multiprovider networks typically contract with some, but not all health care providers in a given area. Additionally, multiprovider network membership restrictions

may yield a procompetetive benefit by giving those excluded the impetus to form competing networks.

¶ 20 Plaintiff in *Retina Associates* made an argument similar to plaintiff's in the case at bar. The plaintiff in *Retina Associates* argued that the BEI/FRI exclusive dealing arrangement represented control over retina referrals necessary for him to compete because those referrals represented relationships that he needed "in the competitive struggle." Plaintiff claimed that the alleged boycott caused him to lose a significant volume of trading and had hampered substantially his ability to compete. The court stated that apart from bald assertions, the plaintiff in *Retina Associates* presented no factual or evidentiary justification for such a finding. The court found that the plaintiff had not demonstrated that the defendants' power over the market of referrals was sufficient to hamper plaintiff in its effort to compete where plaintiff's best-case scenario was that BEI physicians controlled 15% of the referrals made by general ophthalmologists to retina specialists in the Jacksonville area, noting that have refused to impose antitrust liability upon greater showings of market power. The evidence also indicated that the plaintiffs had successfully competed in the market despite the alleged refusal to deal.

**5.** § 3. Combinations In Restraint Of Trade Unlawful.

> It shall be unlawful for any person, partnership, firm, association, corporation, or joint-stock company, or agent thereof, to issue, or to own, trust certificates, or for any person, firm, partnership, association, joint-stock company, or corporation, agent, officer, employee, or the director or stockholders of any corporation, association or joint-stock company, to enter into any combination, contract or agreement with any person, corporation or association, firm, or partnership, or with any stock holder, director or officer, agent or employee of the same, the purpose or effect of which combination, contract or agreement shall be to place the management or control of such combination or combinations, or the conduct or operation of the same, or the output or manufactured product thereof, or the marketing of the same, in the hands of any trust or trustees, holding corporation or association, firm or committee, with the intent or effect to limit or fix the price, or lessen the production or sale of any product or article of commerce, or the use

¶ 21 Plaintiff offered no factual or evidentiary material on which to base his claims of boycott or refusal to deal, or illegal conspiracy or monopoly to restrain trade. Plaintiff's section 2 claim based on illegal price discrimination is without any factual basis. Plaintiff merely argues that the CCMH/FHW consortium offers services in outlying communities at lower prices than it does in Lawton. As to the illegal price discrimination claim, section 2 of title 79 made it unlawful to render any service to the public at lower prices or rates in one city than another, *if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition or restraining trade, or to destroy the competition of any regular established dealer in such commodity or to prevent the competition or any person who, in good faith, intends and attempts to become such dealer.* (emphasis added). Plaintiff has made no showing of an effect or intent to establish a virtual monopoly hindering competition or restraining trade. Plaintiff merely alleged that his practice had been affected by the competition. There was nothing shown by plaintiff to indicate any conspiracy or illegal organization in restraint of trade.

¶ 22 Finally, we turn to plaintiff's claims under 79 O.S.1991 § 3 and § 4.[5] There

> or consumption of the same, or to prevent, restrict, limit or diminish the manufacture or output of any such article of commerce, use or consumption; and every person, firm, partnership, association, joint-stock company or corporation, or any agent, employee, officer, or director of the same, that shall enter into any such combination, contract, management or agreement for the purpose aforesaid, shall be deemed and adjudged guilty of conspiracy in restraint of trade, and punished as provided for in Section 8228 in so far as applicable: Provided, that this section shall not be construed to extend beyond the scope and meaning of the first section of this article.
> § 4. Public Business Defined—Duty To Serve Public.
> Whenever any business, by reason of its nature, extent, or the existence of a virtual monopoly therein, is such that the public must use the same, or its services, or the consideration by it given or taken or offered, or the commodities bought or sold herein are offered or taken by purchase or sale in such a manner as to make it of public consequence or to affect the community at large as to supply, demand, or

was no showing the CCMH is a public business of significance to the community or public at large. Their presence in the Medicaid market did not relate to plaintiff's radiology claims. We find no error where the trial court did not find CCMH to be a public business within the purview of § 4. Plaintiff did not plead or offer evidentiary materials, in support of his § 3 claim, that the public must use CCMH/FHW because of the existence of a monopoly or that the business is of public consequence and is conducted in violation of the provision prohibiting combinations in restraint of trade. *See, James v. Oklahoma Natural Gas Co.*, 181 Okla. 54, 72 P.2d 495 (1937). Summary judgment properly was granted as to plaintiff's third and fourth claims, based §§ 3 and 4 of the Oklahoma Anti–Trust Act. Plaintiff offered neither facts nor evidence in support of those claims.

## CONSPIRACY

¶ 23 The Court of Civil Appeals remanded the cause, in part because they thought that plaintiffs may have had an unresolved conspiracy claim. We have reviewed the record and find that plaintiff did not plead conspiracy as a separate theory of recovery.[6] Plaintiff pled "combinations and conspiracies in restraint of trade" with regard to his claims under §§ 1 and 3 of Title 79. Plaintiff's first and third claims required establishment of a conspiracy, combination, contract or agreement, as one of the elements of the claim. For his claim under § 2 of Title 79, the plaintiff pled only illegal price discrimination. Later, in the supplemental brief permitted by the trial court on the subject of market power, plaintiff first argued "attempt to monopolize" as a separate theory of recovery. At no time was conspiracy to monopolize pled or argued as a separate theory of recovery. Plaintiff's only use of the term "conspiracy" referred to his § 1

and § 3 claims involving "combinations and conspiracies in restraint of trade." Even with a conspiracy claim, a § 1 plaintiff under the Sherman Act must show that defendant's agreement unreasonably restrains trade. *See, Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1012 (6th Cir.1999).

¶ 24 After plaintiff failed to refute defendants' evidentiary material establishing lack of market power, the thrust of plaintiff's argument was that "attempt to monopolize" did not require proof of the defendant's market power. This statement is incorrect. A successful plaintiff, in an attempt to monopolize claim, must demonstrate the relevant product and geographic market and the defendant's economic power in that market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). The United States Supreme Court held in *Spectrum Sports* that an attempt to monopolize claim under § 2 of the Sherman Anti–Trust Act requires inquiry into the relevant product and geographic market and the defendant's economic power in that market.

¶ 25 In a previous antitrust case before this court, *Teleco, Inc. v. Ford Industries, Inc.*, 1978 OK 159, 587 P.2d 1360, the plaintiff likewise failed to present evidence of the existence of an illegal scheme, and we held that summary judgment properly was granted in favor of the defendant. Teleco sued for money damages for violations of Oklahoma's antitrust statute, 79 O.S. § 1 et seq., claiming that a conspiracy existed between Ford Industries and its new distributor to restrict trade in a relevant submarket and that the cancellation of Teleco's distributorship, coupled with the establishment of a new distributorship with Ford's refusal to continue to sell Teleco parts, was a violation of 79 O.S. § 1. The trial court granted summary judgment for Ford, and we affirmed on appeal.

price or rate thereof, or said business is conducted in violation of the first section of this article, said business is a public business, and subject to be controlled by the state, by the Corporation Commission or by an action in any district court of the state, as to all of its practices, prices, rates and charges. And it is hereby declared to be the duty of any person, firm, or corporation engaged in any public business to render its services and offer its

commodities or either upon reasonable terms without discrimination and adequately to the needs of the public, considering the facilities of said business

6. Only after the Court of Civil Appeals questioned whether the judgment was final because of possible unresolved conspiracy claims did plaintiff first urge "conspiracy to monopolize" as a separate theory of recovery.

We found that there was no evidence before the trial court demonstrating the existence of an illegal scheme, or defining a relevant submarket in which a possible illegal monopoly might exist.

¶ 26 Defendants argue that antitrust laws are designed to protect competition, not competitors,[7] and that plaintiff is merely a disgruntled competitor. Plaintiff's deposition reveals that plaintiff became convinced that Mr. Curry considered him an enemy and that Mr. Curry had kept him from being hired in Lawton. Plaintiff believed that Mr. Curry had targeted him and that this prevented him from establishing his teleradiology and mobile networks. At his deposition, plaintiff was questioned, paragraph by paragraph, about the factual basis for the allegations in his petition. Plaintiff's responses reveal that he had no facts on which he based his claims, but simply felt that because he had been "poleaxed" in Lawton, it would be useless to try to get any business from any CCMH–affiliated hospital or doctors associated with First Health West.

¶ 27 Plaintiff has wholly failed to show any actual detrimental effects on competition. He has pled and argued only that his business was affected. He has not supported his assertions with any evidence that the defendants' actions actually had the effect of restricting competition. See, Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir.1996). It is not enough for plaintiff to alleged that he has been injured—he must have suffered an antitrust injury. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 31, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). An antitrust injury is an injury of the type the antitrust laws were intended to prevent, and which flows from that which makes defendants' acts unlawful. NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 103, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). The alleged injury must be palpable and distinct rather than abstract, conjectural or hypothetical. Slowiak v. Land O'Lakes, Inc. 987 F.2d 1293, 1296 (7th Cir. 1993). Mere unfair competition, without more, does not violate antitrust laws. Brown

Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

¶ 28 Thus, it is not enough for plaintiff to assert that he would have made more money if the defendants had not formed their network which excluded him. In Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir.1996), the plaintiff doctor argued that he would have made more money if the defendant hospitals had not engaged in their refusal to deal. The court noted that the plaintiff doctor had no trouble establishing a "booming" practice, and said that the doctor failed to establish a genuine issue of material fact whether there was actual detrimental effect on competition. In the case at bar, defendants provided evidentiary materials produced by the plaintiff reflecting that he had established a very successful medical practice.

¶ 29 The fundamental test of an action which, by its nature, restrains trade, is its effect on the public. Krebsbach v. Henley, 1986 OK 58, 725 P.2d 852, 858. In Krebsbach, the plaintiff argued that it was wrongful for the defendant obstetricians to refuse to associate professionally with him in any way, and that such refusal constituted a restraint of trade in violation of 79 O.S. § 1. Although the effect of defendants' action was, to a small extent, a restraint on the trade available to the plaintiff, we found it to be reasonable under the circumstances where the defendants' actions were mandated by a set of ethics designed to protect the public. We said that no adverse effect upon the public had been demonstrated by plaintiff as a result of the restraint, and the fact that his services were less costly did not establish that adverse effect. The evidence before the trial court failed to give rise to any inference to support the claimed violation of 79 O.S. 1981 § 1.

¶ 30 At the hearing on the motion for summary judgment, Defendants in the case at bar argued that their lack of market power was determinative of the case. Because "market power" is a necessary element of any antitrust claim, if the court fails to find

7. The antitrust laws were designed to protect competition, not competitors. Brown Shoe Co. v.

United States, 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962).

that defendants possess the requisite market power, then, defendants argue, all of plaintiff's claims "disappear." In other words, they say, if the court finds that defendants lacked market power, then there is no antitrust claim, regardless of whether defendants "did all the dastardly deeds that they are accused of doing."

¶ 31 What plaintiff lists as "disputed facts" are merely his own allegations against the defendants. Plaintiff has made numerous allegations and hints at various nefarious things that he might be able to prove through discovery which might lead to support of his claims. But even if we accept every "fact" in the light most favorable to plaintiff, there still is no basis for his claims. Plaintiff has not met the burden of pleading facts and supporting those facts with evidentiary materials. Regarding summary judgments, in *Teleco, supra,* we quoted with approval from *Weeks v. Wedgewood Village, Inc.,* 1976 OK 72, 554 P.2d 780, 784:

> "A party cannot rely on his own pleadings in opposition to affidavits and depositions supporting a motion for summary judgment. The mere assertion in a pleading, when attacked by a motion for summary judgment supported by proof of specific facts in the form of an affidavit or deposition, places on the author of the statement the obligation to present something which will show that when the date of trial arrives, he will have some proof to support the allegations in the pleading. He cannot withhold this showing until the time of trial."

The plaintiff has shown no illegal effect on competition necessary to establish antitrust violations under Oklahoma law, nor evidence of market power sufficient to indicate any anti-competitive effect of defendants' conduct on the relevant market. In summary, plaintiffs claims related only to injury to himself, not injury to competition. The trial judge properly granted summary judgment in favor of the defendants.

**CERTIORARI GRANTED PREVIOUSLY; THE OPINION OF THE COURT OF** CIVIL APPEALS IS VACATED; SUMMARY JUDGMENT AFFIRMED.

¶ 32 ALL JUSTICES CONCUR