**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 19 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STAR FUEL MARTS, LLC,

      Plaintiff - Appellee,

v.

SAM'S EAST, INC.,

      Defendant - Appellant.

No. 03-6067

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-02-202-F)**

Gary S. Chilton, Holladay, Chilton & DeGiusti, PLLC, Oklahoma City, Oklahoma, for Plaintiff - Appellee.

W. Dennis Cross (and David E. Sampson, Stinson, Morrison, Hecker, L.L.P., Kansas City, Missouri and Eric S. Eissenstat, Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, Oklahoma, on the briefs), for Defendant - Appellant.

Before **KELLY**, **LUCERO**, and **O'BRIEN**, Circuit Judges.

**KELLY**, Circuit Judge.

      Defendant-Appellant Sam's East, Inc. ("Sam's") appeals from an order

granting Plaintiff-Appellee Star Fuel Marts, LLC's ("Star") Motion for

Temporary Restraining Order and Preliminary Injunction seeking to enjoin and restrain Sam's from selling motor fuel below cost as defined by the Oklahoma Unfair Sales Act, Okla. Stat. tit. 15, §§ 598.1 – .11 ("OUSA"). On appeal, Sam's argues that the district court abused its discretion in issuing a preliminary injunction because (1) the OUSA does not prohibit discounts given by private wholesale clubs to their members; (2) Sam's sales to its members were not made with the intent and purpose of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor; (3) Sam's sales to its members did not substantially lessen competition or tend to deceive any purchaser or prospective purchaser; and (4) the district court improperly applied the standard for entry of a preliminary injunction. Our jurisdiction arises under 28 U.S.C. § 1292(a)(1). We affirm.

Background

Plaintiff Star Fuel Marts operates 28 gas stations in the Oklahoma City area under the Shell brand. Defendant Sam's East, Inc. operates three Sam's Club stores in the Oklahoma City area that include retail gasoline facilities–on Memorial Road, MacArthur Blvd., and in Midwest City.

Sam's requires its customers to purchase memberships in exchange for the privilege of shopping at the stores. These annual memberships cost between $30

- 2 -

and $100, and entitle the member to purchase any item for sale in its stores, including gasoline.

The Midwest and MacArthur Sam's Club locations sell gasoline only to Sam's Club members. At the Memorial Store, both members and the general retail public may purchase gasoline, and the member price is five cents per gallon lower than the price for nonmembers. Ninety percent of the gas sold at the Memorial Store is to members. Sam's sells only unleaded and premium gasoline.

The district court found that Sam's gasoline operations were "integral to the operations of the store facilities where the gasoline facilities are located." The Sam's Manager's Manual states:

> GAS IS A GREAT BENEFIT TO THE CLUB
> • Gas increases membership. Our members recognize the value and convenience gas adds to the Club. Gas drives both new membership sign-ups and increases renewal rates.
> • Gas increases frequency of shopping and total purchases by our Members. In addition to gas sales, the Members buying gas also shop in the Club more frequently and purchase more.
> • Gas increases total box sales and profits in the Club. Sales and profits at the gas station go to Division 59, which rolls into total box results for the Club.

II Aplt. App. at 112.

The manual also states that "[o]ur members understand gas prices. They will recognize the outstanding value we offer." Id. Additionally, "The Sam's Gas Station is a highly visible extension of the Club. It is right out on the parking lot so our Members see it every time they visit the Club and every time they drive

by.  Our Members' impression of the entire Club is highly influenced by how well the gas station is managed."  Id.

The district court found, based on Sam's internal accounting documents, that at the Sam's Club stores, particularly the Memorial Store, the member price for unleaded gasoline was often below actual laid-in cost (wholesale price plus taxes and delivery charges); Sam's monthly gross profit (total sales minus cost of goods sold) on the gas sold at the store was often negative or extremely low; the gross margin (gross profit as a percentage of net sales) was low; and the net operating losses of the gas outlets were high.  Star Fuel Marts, LLC v. Murphy Oil USA, Inc., No. Civ. 02-202-F, 2003 WL 742191, at *3 (W.D. Okla. Jan. 29, 2003).  For instance, in the eight months ending July 2002, gasoline operations at the three stores lost nearly $250,000.[1]  Id. at *5 & n.3.

Notably, from December 7, 2001, to July 31, 2002, not including revenue from membership fees, there were 41 days on which the member price for the unleaded gasoline at the Memorial Store was below Sam's actual cost, id. at *3; 99 days where it was below statutory cost if using Sam's internally reported actual operating costs, id. at *4; and 149 days where it was below statutory cost if

---

[1]The district court rejected Sam's method of cost allocation–which it had adopted for the purpose of this litigation–that eliminated or significantly reduced the amount of overhead attributable to the gasoline operations.  Star Fuel, 2003 WL 742191, at *3.

- 4 -

using the statute's six percent markup, id.

The district court also found that Sam's gasoline facilities at its three Oklahoma City area stores are "high volume operations." Id. at *8. For example, at the Memorial Store, Sam's monthly volume of gasoline sold is several times the typical volume for a retail gasoline station in Oklahoma City. Id.

Plaintiff Star typically prices its product toward the high end of the gasoline pricing spectrum in the Oklahoma City market. Id. Customers have said to Star's personnel that, because of the pricing difference, they are going to buy their gasoline at Sam's rather than Star's stations. Id. Thus, the district court concluded that Star "has lost volume to Sam's." Id.

## Discussion

Section 598.3 of the Oklahoma Unfair Sales Act ("OUSA") states:

> It is hereby declared that any advertising, offer to sell, or sale of any merchandise, either by retailers or wholesalers, at less than cost as defined in this act with the intent and purpose of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor or otherwise injuring a competitor, impair and prevent fair competition, injure public welfare, are unfair competition and contrary to public policy and the policy of this act, where the result of such advertising, offer or sale is to tend to deceive any purchaser or prospective purchaser, or to substantially lessen competition, or to unreasonably restrain trade, or to tend to create a monopoly in any line of commerce.

Okla. Stat. tit. 15, § 598.3. The statute further provides:

Evidence of advertisement, offering to sell, or sale of merchandise by any retailer or wholesaler at less than cost to him, shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.

Id. § 598.5(c).

Finally, the statute defines "cost to the retailer" as the lower of invoice cost or the replacement cost,[2] plus (1) freight charges, (2) cartage to the retail outlet, (3) taxes, and (4) a six percent markup absent proof of a lesser cost. Id. § 598.2(a).

Thus, when a covered entity sells below cost, as defined, coupled with the intent and purpose contemplated, and achieves one of the prohibited results envisioned, a violation occurs.

The granting of a preliminary injunction is reviewed for abuse of discretion. Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1153 (10th Cir. 2001). A district court abuses its discretion if it commits an error of law or is clearly erroneous in its preliminary factual findings. Id. A preliminary injunction will be set aside if the district court applied the wrong legal standard in deciding to grant a motion for a preliminary injunction.

A.    Application of the OUSA to Private Wholesale Clubs

Sam's argues that the OUSA does not prohibit discounts given by private

---

[2]"Replacement cost" is the price at which the seller could have bought the goods within thirty days prior to the date of sale. Okla. Stat. tit. 15, § 598.2(c).

wholesale clubs to their members. Without citing much law in support of their arguments, Sam's appears to make three claims.

First, Sam's claims that the OUSA does not apply to private clubs that do not sell merchandise to the general public. According to Sam's, to require that Sam's be held liable under the OUSA would "potentially expose to challenge such common practices as discounted sales of food and merchandise by other private clubs, by stores and cafeterias operated by companies for the benefit of their employees, and by other sales operations not open to the general public." Aplt. Br. at 21.

Sam's ignores the fact that it is plainly included in the OUSA's definition of a "retailer." The statute defines a "retailer" as "every person, partnership, corporation or association engaged in the business of making sales at retail within this state." Okla. Stat. tit 15, § 598.2(g). "Sales at retail" include "any transfer for a valuable consideration made in the ordinary course of trade or in the usual prosecution of the seller's business of title to tangible personal property to the purchaser for consumption or use other than resale or further processing or manufacturing." Id. § 598.2(e). As for the "common practices" cited by Sam's, we do not find them sufficiently analogous to express an opinion on their legitimacy in the context of this case. Suffice it to say that Sam's is a retailer notwithstanding that its customers must purchase annual memberships.

Second, Sam's argues that it makes its profit "not only on the sale of merchandise but also on the sale of memberships." Aplt. Br. at 21. According to Sam's, "[t]he sale of memberships . . . is a business in which ordinary retailers such as Star do not compete." Id. To the extent that this is a claim that the membership fees add to the purchase price of Sam's retail gasoline, thereby making the sales price above the statutory cost, the district court addressed this in its extensive findings of fact. The district court found that "no rational allocation of membership fees is sufficient, as a mathematical proposition, to keep Sam's from having repeatedly sold gasoline below statutory cost." Star Fuel, 2003 WL 742191, at *5. Moreover, Sam's sale of memberships is plainly incidental to its merchandising of products, including gasoline.

Finally, Sam's argues that "[b]ecause Sam's Club gives member discounts only to those who have paid cash in advance, they are in essence 'discounts for cash' like the discounts given in the form of trading stamps in Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, 322 P.2d 179 (Okla. 1957), aff'd, 360 U.S. 334 (1959)." Aplt. Br. at 22. This characterization is not supported factually or legally.

In Safeway, the Oklahoma Supreme Court held that giving trading stamps with merchandise sold at the statutory minimum are more like a "discount for cash" than a form of price cutting. 322 P.2d at 186. The court noted that a cash

discount was a "reward for prompt payment," and that it was a "trade practice

long established, and is authoritatively recognized as being not a deduction from

the purchase price." Id. at 184. The court explained that the difference between

trading stamps and cash discounts, on the one hand, and price reductions, on the

other, was that "the stamps are given uniformly and without regard to the type of

goods sold or the purchaser of the same." Id. at 185 (internal quotation marks

and citations omitted). Similarly, in affirming the Oklahoma Supreme Court, the

United States Supreme Court contrasted the giving of trading stamps

(permissible) with selective price cutting (impermissible):

> Trading stamps are given to cash customers 'across the board,'
> namely, the number of stamps varies directly with the total cost of
> goods purchased. Safeway's price-cutting, however, was
> selective. This difference is vital in the context of this Act. One
> of the chief aims of state laws prohibiting sales below cost was to
> put an end to 'loss-leader' selling. The selling of selected goods
> at a loss in order to lure customers into the store is deemed not
> only a destructive means of competition; it also plays on the
> gullibility of customers by leading them to expect what generally
> is not true, namely, that a store which offers such an amazing
> bargain is full of other such bargains.

Safeway Stores, Inc. v. Okla. Retail Grocers Ass'n, Inc., 360 U.S. 334, 340

(1959) (emphasis added). Unlike trading stamps and cash discounts, Sam's price

cuts apply only to one specific product–gasoline. This kind of selective price

reduction creates a "loss leader," which, regardless of the wisdom of the

legislation, is exactly what the OUSA was intended to prohibit. See Glenn Smith

Oil Co. v. Sheets, 704 P.2d 474, 478 (Okla. 1985) (purpose of OUSA is to prevent loss leader selling and ensure the viability of small merchants).

B.    Illegal Intent

Sam's argues that the district court wrongfully decided that its sales to its members were made with the intent and purpose of inducing the purchase of other merchandise, unfairly diverting trade from a competitor, or otherwise injuring a competitor.  The district court's decision that there was such intent and purpose is a question of fact that we review for clear error.  Ben Hur Coal Co. v. Wells, 242 F.2d 481, 483 (10th Cir. 1957).

Under the OUSA, "[e]vidence of advertisement, offering to sell, or sale of merchandise by any retailer or wholesaler at less than cost to him, shall be prima facie evidence of intent to injure competitors."  Okla. Stat. tit. 15, § 598.5(c).  Thus, this evidence may be rebutted by proof of lack of injurious intent.  Glenn Smith, 704 P.2d at 478.

Sam's argues that the district court "ignor[ed] substantial evidence that Sam's had no such intent," and therefore wrongfully found that the prima facie evidence of intent to injure competitors was not rebutted.  Aplt. Br. at 47 (citing I Aplt. App. at 149-50; II Aplt. App. at 6).  However, the affidavit and testimony of Richard Ezell, the operations manager for Sam's fuel division, stating that "Sam's intent is at all times to meet competition and price within the confines of the

Oklahoma Unfair Sales Act," II Aplt. App. at 6 (Ezell Aff.); see also I Aplt. App. at 149-50 (Ezell Test.), is simply not enough to rebut this presumption. See Lind v. McKinley, 161 P.2d 1016, 1018 (Okla. 1945) ("presumptions indulged by reason of a statutory prima facie rule of evidence may be overcome . . . by evidence of facts . . . clearly proven") (emphasis added), overruled on other grounds by Gardner v. Jones, 309 P.2d 731 (Okla. 1956); see also Johns v. Edwards, 250 P. 1012, 1014 (Okla. 1926) (to overcome prima facie evidence, "a very clear preponderance of the evidence is required") (internal quotation marks and citations omitted).

Moreover, the district court also found that Sam's practice of pricing gasoline below cost was done with "the intent and purpose of inducing the purchase of other merchandise." Star Fuel, 2003 WL 742191, at *12. The court based this finding on Sam's internal management manual, which, as discussed above, indicated that gasoline "increases frequency of shopping and total purchases by our Members," that it "drives both new membership sign-ups and increases renewal rates," and "increases total box sales and profits in the Club." II Aplt. App. at 112.

Sam's addresses this finding of the district court for the first time in its reply brief. Generally, arguments raised for the first time on appeal in an appellant's reply brief are waived. Gaines-Tabb v. ICI Explosives, USA, Inc.,

- 11 -

160 F.3d 613, 624 (10th Cir. 1998). For the sake of completeness, however, we address Sam's two arguments on this point. First, Sam's argues that memberships are not "merchandise." Aplt. Reply Br. at 15. Even if this were true, it does not affect the fact that Sam's own internal documents cite gasoline as a way of "increas[ing] frequency of shopping and total purchases" by their members. II Aplt. App. at 112. The district court's finding is not clearly erroneous. Second, Sam's argues that "inducing the purchase of other merchandise" is only a prohibited intent if the prices of the "other merchandise" are inflated. Aplt. Reply Br. at 15. This is simply contrary to the plain wording of the statute, which does not have such a requirement.

Finally, the district court also found that Sam's gasoline was priced with the intent of unfairly diverting trade from a competitor. Star Fuel, 2003 WL 742191, at *12. Sam's argues that the district court based this finding only on Sam's desire to project a low price image and to best its competitors. However, the district court based its finding on an exhaustive list of factual findings, including the fact that Sam's gasoline operations were operating with losses for such a sustained period of time, and that Sam's can easily get a general idea of what a competitor's cost would be. Id. at *6-7. These findings are not clearly erroneous.

C.    Illegal Result

Sam's argues that the district court wrongly decided that Sam's sales of gasoline to its members substantially lessened competition or tended to deceive purchasers or prospective purchasers.

1.    Substantial Lessening of Competition

In asserting that the district court wrongly decided that Sam's sales of gasoline to its members substantially lessened competition, Sam's claims that (1) the evidence was insufficient to show a substantial lessening of competition; and (2) the OUSA's language does not provide for a "statutory boost" in showing a substantial lessening of competition, but even if it did, the presumption was sufficiently rebutted.

a.    Evidence of Substantial Lessening of Competition

In support of its argument on the lack of evidence on the lessening of competition, Sam's cites to testimony by Alan Wilkerson, Star's chief operating officer, who apparently said that the Oklahoma City gasoline market was competitive before Sam's entered it, and that since Sam's entry, it is "even more so." Aplt. Br. at 29 (citing I Aplt. App. at 200). Sam's also points to testimony from its expert witness, Dr. Joseph Jadlow, who also claims that the Oklahoma City gasoline market has not been made less competitive by Sam's pricing. Id. at 30 (citing I Aplt. App. at 271, 279).

The district court's findings, however, established that Sam's gasoline sales are "by any standard, high volume operations." Star Fuel, 2003 WL 742191, at *8. At the Memorial Store, Sam's monthly volume of gasoline sold is several-fold the typical volume for a retail gasoline station in Oklahoma City. The court also concluded that such volume was due to Sam's below-cost pricing. Id. This substantial increase in Sam's market share and the corresponding decrease in its competitors' market share, coupled with the fact that the sales achieved by Sam's were achieved through below-cost pricing, provide support for the district court's finding that Sam's sale of gasoline resulted in a substantial lessening of competition.[3]

---

[3]Sam's cites Beville v. Curry, 39 P.3d 754, 761 (Okla. 2001), for the proposition that, for a plaintiff to show a lessening of competition, it must show that the defendant had sufficient market power. Beville was a suit alleging an attempt to monopolize under the Oklahoma Antitrust Reform Act (OARA), Okla. Stat. tit. 79, §§ 201–212, not the OUSA. The OARA is Oklahoma's version of the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1-7, 12-27, and is interpreted in accordance with federal antitrust law. Okla. Stat. tit. 79, § 212. There is no federal counterpart to the OUSA, and federal antitrust law is not authoritative in its interpretation.

This distinction between the two Oklahoma statutes is important because an attempted monopolization claim requires not only anticompetitive conduct, but that the defendant have sufficient market power such that there is a "'dangerous probability' that an attempt to achieve monopoly power will succeed." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 251 (1993); see also Beville, 39 P.3d 760-61. When the anticompetitive conduct at issue is below-cost selling, the plaintiff must show that there is a dangerous probability that the defendant will recoup any losses it sustained in selling below cost. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); United States v. AMR Corp., 335 F.3d 1109, 1115 (10th Cir. 2003).

Contrary to Sam's contention, the injuries Star claims to have suffered are not those that result from an increase in competition. In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977), the Supreme Court held that a plaintiff cannot complain of competitive injuries unless those injuries were of the "type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Thus, in order to determine whether Sam's pricing practices substantially lessened competition, the OUSA must be viewed in light of its dual purposes, to prevent loss leader selling and to protect small businesses from large competitors capable of driving them out of business by below-cost sales. So-Lo Oil Co. v. Total Petroleum, Inc., 832 P.2d 14, 17 (Okla. 1992).

Sam's pricing allows it to sell its gasoline below cost, and there is nothing its competitors can do consistent with the OUSA to allow them to compete with it. See Glenn Smith, 704 P.2d at 478 ("[A] sale cannot be made below cost to meet the price of a competitor who is selling at . . . a price below that competitor's cost."); Safeway Stores v. Okla. Retail Grocers Ass'n, 322 P.2d 179, 182 (Okla. 1958) ("[T]he appropriate remedy [of a competitor's below cost

The purpose of the OUSA, however, is simply to prevent loss leader selling and to protect small businesses. Whether a defendant, in the future, may recoup its losses is irrelevant. Thus, under the OUSA, a defendant's market power is not at issue; rather, the inquiry is limited to the defendant's intent, and whether competitors (or customers) have been injured.

- 15 -

pricing] was . . . not by retaliation.").  This gives Sam's an unfair advantage, and is exactly what the OUSA was designed to prevent.

Sam's also argues that loss of sales by a single competitor does not establish that competition has been substantially lessened.  However, the evidence goes further than showing injury only to Star.  The district court's findings indicate that because of the volume of Sam's gasoline sales and its below-cost pricing, competition was lessened in Oklahoma City in the much of area surrounding Sam's Club stores.  See Star Fuel, 2003 WL 742191, at *8.  Moreover, when increased sales are achieved through below-cost pricing, an analysis into whether there has been a substantial lessening of competition under the OUSA and similar unfair pricing statutes necessarily entails an examination of individual competitors in the aggregate.  See, e.g., Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117-18 (1986) (pricing below cost "is a practice that harms both competitors and competition"); Home Oil Co. v. Sam's East, Inc., 199 F. Supp. 2d 1236, 1242 (M.D. Ala. 2002) ("A showing by even one of the defendant's competitors of injury is sufficient" to prove that defendant's below-cost sale of gasoline "injure[d] competition."); Star Serv. & Petroleum Co. v. State ex rel. Galanos, 518 So. 2d 126, 130 (Ala. Civ. App. 1986) ("[I]njury to competition . . . necessarily includes injury to competitors.").

b.     Statutory Boost

Sam's also argues that, contrary to the district court's holding, the OUSA's language does not provide for a "statutory boost" in showing a substantial lessening of competition. The OUSA states that "[e]vidence of advertisement, offering to sell, or sale of merchandise by any retailer or wholesaler at less than cost to him, shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition." Okla. Stat. tit. 15, § 598.5(c). According to Sam's, because the statute does not expressly use the word "result," the statutory boost provides prima facie evidence only of the <u>intent</u> to destroy or substantially lessen competition, not its <u>result</u>.

Such a construction would render meaningless the specific reference to "substantially lessen competition" in the statute. To "substantially lessen competition" is one of the <u>results</u> that is prohibited by the OUSA, not one of the prohibited <u>intents</u>. Moreover, as noted by the district court, because the statute prescribes that below-cost sales "shall be prima facie evidence of intent to injure competitors <u>and</u> to destroy or substantially lessen competition," Okla. Stat. tit. 15, § 598.5(c) (emphasis added)–using the conjunctive "and" instead of the disjunctive "or"–it is more likely that the Oklahoma Legislature intended to establish prima facie evidence <u>both</u> of the <u>intent</u> to injure competitors and of the <u>result</u> of destroying or substantially lessening competition. <u>Star Fuel</u>, 2003 WL

742191, at *12. Reinforcing this conclusion is the legislature's repetition of the "to" infinitive before "destroy or substantially lessen competition," which would have been unnecessary if meant to refer to another intent.

More importantly, despite Sam's use of various canons of statutory construction to decipher the statute, the Supreme Court of Oklahoma's decision in Diehl v. Magic Empire Grocers Ass'n, 399 P.2d 460 (Okla. 1965), indicates its stance on the issue. In Diehl, the defendant grocer was advertising items below cost. After quoting § 598.5(c), the court found only one significant fact–that the defendant through advertising circulars offered for sale certain items below the required 6% markup. Id. at 462. The court then concluded that "the acts of defendant's servants in advertising the foregoing items for sale at the unlawfully reduced prices indicated, absent any showing to the contrary on his part, were in violation of the statute." Id. at 463 (emphasis added). The emphasized language indicates that once it is shown that a retailer is selling items below its cost, the burden shifts to the retailer to show it did not violate the OUSA.

Apparently recognizing the existence of the presumption of substantially lessened competition, Sam's argues that the presumption was successfully rebutted. Prima facie evidence is "such evidence as in the judgment of law is sufficient to establish a fact, and if not rebutted, remains sufficient to establish that fact." Glenn Smith, 704 P.2d at 478. As noted above, statutory prima facie

rules of evidence in Oklahoma may be rebutted only by "clearly proven" facts.

Sam's offers little more evidence to rebut this presumption than the above referenced testimony of Star's chief operating officer and Dr. Joseph Jadlow. The district court found that this was insufficient to rebut the prima facie showing.[4] Star Fuel, 2003 WL 742191, at *13. Moreover, as discussed above, Star presented substantial evidence tending to show that Sam's below-cost pricing of gasoline unfairly increased its market share while decreasing the market share of its competitors. The existence of this evidence precludes a determination that the district court's finding was clearly erroneous.

2.    Deception

Although the district court was not required to do so after having found the prima facie showing of lessening of competition unrebutted, it nevertheless found that Sam's below-cost pricing of gasoline tended to deceive purchasers or prospective purchasers. Star's position was that there tended to be deception because its customers, not knowing that Sam's was pricing below cost, thought Star was "gouging them." I Aplt. App. at 185. The court, however, found it

---

[4]Sam's claims that because the district court, upon receipt of Dr. Jadlow and Alan Wilkerson's testimony, said that the issue of substantial lessening of competition "[has] been put in play," Sam's had successfully rebutted the presumption. Aplt. Br. at 42 (quoting I Aplt. App. at 357-58). However, upon considering the totality of the evidence, the district court found Sam's rebuttal testimony "wanting." Star Fuel, 2003 WL 742191, at *14. This finding, and the rejection of Sam's evidence on this point, is not clearly erroneous.

"inherent in the below cost sale of one commodity among hundreds or thousands sold at the same establishment [that there] is the implication that the pricing of the item which is sold below cost is indicative of pricing generally at the same establishment." Star Fuel, 2003 WL 742191, at *13. In light of our disposition of this issue, we need not decide which type of deception is contemplated by the OUSA.

It appears from our review of the materials presented that the district court made its finding of customer deception without any evidence having been presented in support of this finding. Whether the pricing policy of Sam's tended to deceive is a factual matter which must be proved as any other fact. However, because it is not necessary to the analysis herein, we do not reach this issue and express no opinion thereon.

D.    Preliminary Injunction

Before a preliminary injunction may be entered pursuant to Fed. R. Civ. P. 65, the moving party must establish that:

> (1) [the movant] will suffer irreparable injury unless the injunction issues; (2) the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits.

Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992)).

"[W]hile the standard to be applied by the district court in deciding whether a party is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion." Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975).

We have held that "[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001) (quoting Atchison, Topeka & Santa Fe Ry. Co. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981)); see also Burlington N. R.R. Co. v. Bair, 957 F.2d 599, 601 (10th Cir. 1992) ("[I]t is not the role of the courts to balance the equities between the parties [where] Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in . . . any activity which the statute prohibits.").[5] The district court properly concluded that this rule applies in the present case because the OUSA itself provides for injunctive relief. See Okla. Stat. tit. 15, § 598.5(a).

_____

[5]Sam's only response to this is that federal courts apply federal preliminary injunction standards in diversity cases. Aplt. Br. at 49 (citing Equifax Servs. Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990)). This argument is inapposite; the standard articulated in Kikumura is a federal standard.

Nevertheless, the district court properly found that Star would suffer irreparable harm if the preliminary injunction were not issued. Specifically, the court found that "Sam's below cost sales of gasoline have had an inherently difficult to measure effect both on plaintiff's sales volume and on the good will plaintiff enjoys with the consuming public." Star Fuel, 2003 WL 742191, at *14.

Sam's does not address in its brief the district court's finding on the effect of Sam's pricing on Star's goodwill. In light of this effect on Star, this case is distinguishable from College Craft Cos. v. Perry, Civ. No. 3-95-583, 1995 WL 783612, at *8 (D. Minn. Aug. 9, 1995), cited by Sam's, where the plaintiff "failed to present clear evidence that Perry has disparaged their name, has invaded their clientele, has raided their employee roster, or has otherwise deprecated their good will."

As for the court's finding that Sam's pricing negatively affected Star's sales volume, Sam's argues that any effect is mere "speculation." Aplt. Br. at 50. However, this argument ignores the district court's extensive findings that "[g]iven the volumes of gasoline sold by Sam's and the proximity of Sam's stations to plaintiff's stations in central Oklahoma, there is no room for doubt that plaintiff has been 'injured' by Sam's below-cost sales." Star Fuel, 2003 WL 742191, at *7. Moreover, the court expressly found that such loss of sales was "to an extent which is difficult to quantify." Id. at *14. This finding further

- 22 -

distinguishes the case from <u>Perry</u>, where the "[p]laintiffs d[id] not suggest any inability to calculate their losses." 1995 WL 783612, at *8.

The other preliminary injunction factors are also met. First, the threatened injury to Star outweighs whatever damage the preliminary injunction may cause Sam's. In light of the district court's finding that Sam's was pricing its gasoline below cost, the preliminary injunction only requires Sam's to comply with the OUSA. Any loss of good will Sam's may suffer from having to charge the same amount as everyone else is outweighed by the loss Star would suffer if Sam's were allowed to continue selling below its cost.

Second, the preliminary injunction is not adverse to the public interest. Sam's argues that "unrestrained price competition is in the public interest because it leads to lower prices for consumers." Aplt. Br. at 51. However, considering the dual purposes of the OUSA to prevent loss leader selling and to protect small businesses, this preliminary injunction furthers those goals and is therefore not adverse to the public interest.

Finally, Star has established a substantial likelihood of success on the merits. The Tenth Circuit has adopted the Second Circuit's liberal definition of "probability of success." <u>Heideman</u>, 348 F.3d at 1189. Accordingly, where the moving party has established that the three "harm" factors tip decidedly in its favor, the "probability of success" requirement is relaxed. <u>Id.</u> In such cases,

"[t]he movant need only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" Id. (internal quotations marks omitted). In light of the totality of evidence, the district court found that Star had "made a strong factual showing," and that Sam's factual defenses were "wanting." Star Fuel, 2003 WL 742191, at *14.

The dissent contends that Star has not demonstrated a substantial likelihood of success on the merits because it cannot establish that Sam's below-cost pricing substantially lessened competition. The dissent erroneously attempts to align the OUSA with federal antitrust law, and overlooks the OUSA's statutory presumption that below-cost pricing results in substantial lessening of competition. Okla. Stat. tit. 15, § 598.5(c).

The dissent also discounts the considerable evidence supporting a substantial lessening of competition. Sam's Memorial Road station sells several times the volume of gasoline of typical stations in Oklahoma City. This high volume of sales corresponds to a loss of sales by Star and the other stations in the area. Importantly, the OUSA prohibits Star and the other gas stations from meeting Sam's below-cost price. Glenn Smith Oil Co. v. Sheets, 704 P.2d 474, 478 (Okla. 1984); see also Okla. Stat. tit. 15, § 598.7 (allowing below cost sales only to meet competitors' sales at or above cost); Safeway Stores v. Okla. Retail Grocers Ass'n, 322 P.2d 179, 182 (Okla. 1958). Thus, price competition on

Sam's terms is not only lessened, it is impossible and illegal.

More importantly, the dissent fails to recognize that the OUSA is simply not a state version of a federal antitrust statute–it is in a completely different section of the Oklahoma code from the Oklahoma Antitrust Reform Act–and therefore importation of federal antitrust standards is inappropriate. The reason Oklahoma's antitrust law is interpreted in accordance with federal standards is that the state statute explicitly requires it. Okla. Stat. tit. 79, § 212. Despite any similarity in language between the OUSA and federal law, neither the Oklahoma legislature nor the Oklahoma courts have ever suggested superimposing the Robinson-Patman Act's rationale to cases involving below-cost sales. See Safeway, 322 P.2d at 181. No reported OUSA case has ever required that a plaintiff establish that a below-cost seller has a dangerous probability of recouping its investment in below-cost prices and for good reason.

The policy behind the OUSA and the cases interpreting it directly refute the dissent's position. The Oklahoma Supreme Court has recognized that the OUSA was enacted to insure the viability of individual small merchants who cannot afford to sell below cost. Glenn Smith, 704 P.2d at 478. Regardless of whether the lower gasoline prices ultimately benefit consumers, the legislature made a clear decision to protect merchants like Star against larger competitors like Sam's. The strict adherence to this policy is evidenced in Glenn Smith, which

contained no discussion of any marketwide effect of the defendant's pricing practices other than the trial court's comments that "[plaintiff] is financially damaged by his competitor selling gas eight cents cheaper, within a few blocks under similar sales circumstances." Id. at 476. Imposing a requirement that a plaintiff establish that a below-cost seller will actually be able to recoup its loss by exercising monopoly power and charging higher than competitive prices for a sustained period, see Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219 (1993), would defeat the purposes of the OUSA. Small competitors are not required to go out of business (with their market share going to the below-cost seller) before the OUSA can be enforced.

Given the statutory presumption coupled with the evidence discussed above, the district court's conclusion that Sam's evidence did not rebut the prima facie case is not clearly erroneous. The district court could readily find that the statements of Dr. Jadlow and Mr. Wilkerson that competition was not lessened fail to provide the "very clear preponderance of the evidence" necessary to overcome Star's prima facie case. Johns v. Edwards, 250 P. 1012, 1014 (Okla. 1926).

The district court did not abuse its discretion in issuing the preliminary injunction.

AFFIRMED.

- 26 -

03-6067, <u>Star Fuel Marts, LLC v. Sam's East, Inc.</u>

**LUCERO**, J., Circuit Judge, dissenting.


I fear that the primary effect of today's decision will be to injure consumers in the Oklahoma City area in both the short and long term. This is opposite of the result intended by the Oklahoma legislature. In order to conclude that a preliminary injunction was entered properly below, I must be persuaded that Star demonstrated a substantial likelihood that it would satisfy the requirements of the Oklahoma Unfair Sales Act ("OUSA"). OUSA requires Star to establish: (1) below-cost sales, (2) with the intent of inducing the purchase of other merchandise, unfairly diverting trade from a competitor, or otherwise injuring a competitor, <u>and</u> (3) a resulting deception, lessening of competition, restraint of trade, or tendency to create a monopoly. Okla. Stat. tit. 15, § 598.3. Because Star fails to establish any element of the third section of the OUSA, the requirements for a preliminary injunction have not been met. Accordingly, I respectfully dissent from the majority's opinion to the contrary.

Specifically, the third section of the OUSA prohibits below-cost sales "where the result of such . . . sale [tends] to deceive any purchaser or prospective purchaser, or to substantially lessen competition, or to unreasonably restrain trade, or to tend to create a monopoly in any line of commerce." <u>Id.</u> Applying this language, the district court found that Sam's sales of gasoline to its members

substantially lessened competition and tended to deceive purchasers or prospective purchasers. Star Fuel Marts, LLC v. Murphy Oil USA, Inc., No. Civ. 02-202-F, 2003 WL 742191, at *14 (W.D. Okla. Jan. 29, 2003). The district court did not find that Sam's below cost sales unreasonably restrained trade or tended to create a monopoly, and the majority effectively concedes that the district court's conclusion regarding deception of purchasers is unsupported by the record. (Maj. Op. at 19–20.) Thus, Star is left with all of its eggs in one basket—the contention that Sam's below-cost sales resulted in a substantial lessening of competition.

The majority's explanation for its conclusion that Star established substantial injury to competition is less than compelling. Noting that Sam's gasoline sales are "high volume operations" achieved by below-cost pricing, the majority, without further elaboration, leaps to the conclusion that

> this substantial increase in Sam's market share and the corresponding decrease in its competitors' market share, coupled with the fact that the sales achieved by Sam's were achieved through below-cost pricing, provide support for the district court's finding that Sam's sale of gasoline resulted in a substantial lessening of competition.

(Maj. Op. at 14.)

But the conclusion drawn from the foregoing generalization of the relevant facts is most assuredly erroneous. Star's profits may have been affected by Sam's below-cost sales. However, "[a]ntitrust laws were passed for the protection of

-2-

competition, not competitors." United States v. AMR Corp., 335 F.3d 1109, 1115 (10th Cir. 2003) (citation omitted). It is undisputed that Sam's holds less than three percent of the market share in the Oklahoma gasoline market; there is no evidence in the record that even one competitor has been driven from the market by Sam's below-cost sales, and there is not one iota of evidence that proves that there has been a substantial lessening of competition. To the contrary, all evidence demonstrates an increase—not a lessening—of competition. There may be some evidence that Star's profits have decreased by competition, but that is not properly our concern.

Yet, even if Star could establish injury to competition by a mere showing of a reduction of its profits, it would not prevail, for Star has failed to present any evidence tending to show a dangerous probability of recoupment by Sam's.

In determining the meaning of "substantially lessened competition" based on Oklahoma state law, we look to federal antitrust law for guidance when the language and purpose of the Oklahoma antitrust statute closely resembles that of federal antitrust law. Harolds Stores, Inc. v. Dillard Dept. Stores, Inc., 82 F.3d 1533, 1550–51 (10th Cir. 1996); Teleco, Inc. v. Ford Indus., Inc., 587 P.2d 1360, 1362 (Okla. 1978) (explaining that "the provisions of [the Oklahoma] antitrust statutes are similar to antitrust legislation, and that interpretation of Federal antitrust legislation provides valuable assistance in interpreting the provisions of

the Oklahoma statutes"); <u>Young v. Seaway Pipeline, Inc.</u>, 576 P.2d 1148, 1150 (Okla. 1977) ("Oklahoma [antitrust] statutes are patterned after the federal enactments being at times both cumulative and complimentary to federal legislation."); <u>Oakridge Invs., Inc. v. Southern Energy Homes, Inc.</u>, 719 P.2d 848, 850 (Okla. App. 1986).[1]

Although the majority acknowledges that the Oklahoma Supreme Court has looked to federal antitrust law to interpret other state antitrust statutes, <u>see, e.g.</u>, <u>Beville v. Curry</u>, 39 P.3d 754, 761 (Okla. 2001) (looking to federal antitrust law for guidance in interpreting the Oklahoma Antitrust Reform Act), it rejects Sam's reliance on <u>Beville</u> for the proposition that Star must demonstrate a dangerous probability of recoupment. (Maj. Op. at 14 n.3.) In support of this conclusion,

---

[1] Oklahoma is not alone in its reliance on federal antitrust statutes to interpret similar state antitrust statutes and provisions. <u>See</u> <u>Int'l Healthcare Mgmt. v. Hawaii Coalition for Health</u>, 332 F.3d 600, 609 (9th Cir. 2003) (interpreting Hawaii antitrust statutes "in accordance with judicial interpretations of similar federal antitrust statutes"); <u>Alpha Shoe Serv. v. Fleming Cos., Inc.</u>, 849 F.2d 352, 353 (8th Cir. 1988) (same, Missouri); <u>Mikeron, Inc. v. Exxon Co., U.S.A.</u>, 264 F. Supp. 2d 268, 276 (D. Md. 2003) (same, Maryland); <u>Reading Int'l v. Oaktree Capital Mgmt. LLC</u>, 2004-1 Trade Cases P 74,267, 2003 WL 22928728, at *24 (S.D.N.Y. Dec. 10, 2003) (same, New York); <u>Urdinaran, M.D. v. Aarons</u>, 115 F. Supp. 2d 484, 492 (D.N.J. 2000) (same, New Jersey); <u>Iron Workers Local Union No. 17 v. Philip Morris Inc.</u>, 23 F. Supp. 2d 771, 791 (N.D. Ohio 1998) (same, Ohio); <u>Rockholt Furniture, Inc. v. Kincaid Furniture Co., Inc.</u>, 1998 WL 1661384, at *7 (E.D. Tenn. July 6, 1998) (same, Tennessee); <u>Smalley & Co. v. Emerson & Cuming, Inc.</u>, 808 F.Supp. 1503, 1516 (D. Colo. 1992) (same, Colorado); <u>City of St. Paul v. FMC Corp.</u>, 1990 WL 259683, at *2 (D. Minn. Nov. 14, 1990) (same, Minnesota); <u>Sharp v. Commercial Solvents Corp.</u>, 232 F.Supp. 323, 327 (N.D. Tex. 1964) (same, Texas).

-4-

the majority explains that in light of the purposes of the OUSA and the absence of a federal statutory counterpart, federal antitrust law should not be authoritative in the instant case  (Id.)

I disagree with the majority's conclusion that we should not look to federal law for guidance in interpreting the OUSA.  A close review of federal antitrust statutes reveals that the purpose and language of the OUSA are directly analogous to § 2(a) of the Clayton Act as amended by the Robinson-Patman Act.  Relevant to our inquiry, the Robinson-Patman Act declares it unlawful to engage in below-cost pricing that injures direct competitors when the result is to substantially lessen competition or tend to create a monopoly.  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219 (1993).  The Robinson-Patman Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a) (emphasis added); Brooke Group, 509 U.S. at 219–20.  "By its terms, the Robinson-Patman Act condemns price discrimination only to the extent that it threatens to injure competition."  Brooke Group, 509 U.S. at 220.  Further,

the Supreme Court explained that to establish a violation under the Robinson-Patman Act, it is not enough to show intent to injure competition and below-cost sales; a violation also requires a demonstration of requisite effect, e.g., substantially lessened competition. Id. at 225.

Both the language and the purpose of the OUSA mirror those of the Robinson-Patman Act. Each statute protects direct competitors from below-cost pricing that results in "substantially lessened competition." See 15 U.S.C. § 13(a); Okla. Stat. tit. 15, § 598.3. Contrary to the majority's conclusion, the OUSA does have a counterpart in federal antitrust law, and I would therefore look to the Robinson-Patman Act for guidance.

Interpreting the Robinson-Patman Act, the Supreme Court has explained that "the Robinson-Patman Act should be construed consistently with broader policies of the antitrust laws." Brooke Group, 509 U.S. at 220. In an attempt to define the effect of substantially lessened competition, the Court explained:

> [w]hether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, two prerequisites to recovery remain the same. First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs . . . . The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, . . . a dangerous probability, of recouping its investment in below-cost prices.

Id. at 222–24 (citations omitted).

Applying this two-part test, we have recognized that while "the short-run loss [of below-cost pricing] is definite . . . the long-run gain depends on successfully neutralizing the competition," and that "the success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." AMR, 335 F.3d at 1114 (citation omitted). Consistent with the requirements of the Robinson-Patman Act, I would require Star to establish that Sam's has a dangerous probability of recouping its investment in below-cost prices. See Brooke Group, 509 U.S. at 223–24. "Without a dangerous probability of recoupment, competition remains unharmed even if individual competitors suffer." AMR, 335 F.3d at 1115.

I do not dispute the majority's conclusion that Sam's priced its gasoline below cost. However, it is not enough for Star to have alleged that it was financially harmed by Sam's below-cost sales. Rather, the OUSA can only logically be read to protect businesses like Star from "substantially lessened competition" when the allegedly offending entity has enough market power to force competitors out of the market and keep them out long enough to recoup its losses. Sam's holds less than three percent of the market share in the Oklahoma City gasoline market. Considering Sam's limited market share and the absence of

-7-

any evidence that Sam's can recoup the losses that result from its below-cost sales of gasoline, I cannot conclude that Star has demonstrated that Sam's below-cost sales resulted in "substantially lessened competition" under any relevant definition of the term.

The majority also concludes that evidence of below-cost pricing is prima facie evidence of substantial injury to competition. Even assuming arguendo that the majority correctly reaches this conclusion, I disagree that "[t]he prima facie showing stands unrebutted." Star Fuel Marts, 2003 WL 742191, at *13. We have explained that "the mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition;" moreover, "mistaken inferences may deter the very conduct the antitrust laws were created to protect." AMR, 335 F.3d at 1114 (quotations omitted). Before the district court, Sam's presented the testimony of Dr. Jadlow and Mr. Wilkerson, both of whom testified that Sam's lower prices did not diminish competition in the Oklahoma City gasoline market; rather, Sam's lower prices may actually have stimulated competition in the relevant market. At the very least, this evidence was sufficient to rebut the prima facie evidence of lessened competition. Thus, the majority's statement that the district court's determination that the prima facie evidence of the result of substantially lessened competition stands unrebutted is clearly erroneous as well.

-8-

Star's failure to establish any of the OUSA's requisite results under the third requirement of the statute is fatal to its attempt to demonstrate a substantial likelihood of success on the merits. Without such a likelihood, the preliminary injunction cannot stand. For the foregoing reasons, I **DISSENT**.